## Ronnie's Bar, Inc. v. Pennsylvania Labor Relations Board, Appellant.

460

Argued April 26, 1963.  Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*James F. Wildeman,* Assistant Attorney General,
with him *Robert D. Ronco,* Assistant Attorney General,
and *Walter E. Alessandroni,* Attorney General, for
Pennsylvania Labor Relations Board, appellant.

*Arthur Silverman,* with him *Ettinger, Gallagher &
Silverman,* for appellee.

*Richard H. Markowitz,* with him *Richard Kirsch-
ner,* and *Wilderman, Markowitz & Kirschner,* for inter-
venor.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, July 2, 1963:

Ronnie's Bar, Inc. (Ronnie's Bar), purchased a restaurant at 201 North Broad Street, Philadelphia, on November 10, 1960 from the Broad-Race Corporation (Broad-Race), a going concern, which had purchased the restaurant six months previously from Brown's Bar, Inc. (Brown), also a going concern. The restaurant had never ceased operation because of these transactions and, moreover, the personnel employed by the restaurant did not change except as a result of normal fluctuations of employees leaving for their own personal reasons.[1]

At the time the restaurant was owned and operated by Brown, all the employees were union members, three different union locals being involved; one for the bartenders, another for the kitchen personnel, and a third, the Waiters and Waitresses Union, Local 301, AFL-CIO (Union), for dining room personnel.

Lest it be thought this proliferation of unions unduly burdened the employers it must be noted that all three locals are craft unions of one parent body, the Hotel and Restaurant Employees and Bartenders International Union. Where more than one such craft union local is involved in any one establishment, it may enter into a Local Joint Executive Board contract whereby each craft union negotiates for its members with the employer and the result of each individual craft negotiation becomes a part of the Local Joint Executive Board Contract.

In 1956, an organization known as the Greater Philadelphia Restaurant Association (Association) was formed and, after its formation, the unions negotiated with the Association. The Association and the unions

---

[1] Some had worked there for many years, one waitress for 20 years.

agreed upon a master contract binding on all members of the Association and the unions in the Local Joint Executive Board of Philadelphia. Brown was a member of the Association and, therefore, bound under the master contract. There is some evidence that Broad-Race had become a member of the Association and there is certainly evidence that Broad-Race did not contribute to the Welfare Fund established under the master contract, or, at the least, did not contribute voluntarily.

At some time before Ronnie's Bar took over the operation of the restaurant, its president and secretary-treasurer met with the president of the Union in the Union's office and informed him that they were taking over but on one condition, i.e., that they would not employ one of the waitresses. Broad-Race's delinquency to the Welfare Fund also was discussed. At a subsequent meeting between the same parties, attended also by the secretary-treasurer of the Union, Ronnie's Bar informed the Union that they would not join the Association. Upon confirmation from the president of the Association that Ronnie's Bar had not joined the Association, the Union then felt free to negotiate independently.

At subsequent meetings, it developed that Ronnie's Bar was unwilling to grant a three-week paid vacation to two waitresses who had worked in the restaurant for periods of over five years. The Union took the position that the waitresses were entitled to this length vacation under the master contract previously in effect; Mr. Chesnick, the secretary-treasurer of Ronnie's Bar, felt that only the length of service with Ronnie's Bar should count toward the computation of vacation entitlement and that previous service with other owners should not be taken into account. Mr. Chesnick had been manager of the restaurant when it was owned by Brown and knew that Brown had a labor contract with the Union and that the employees were Union

members, but he denied that he knew that Broad-Race had such a contract.

Negotiations between the Union, the other craft unions and Ronnie's Bar took place thereafter but always an impasse was reached on the vacation question. Ronnie's Bar was apparently willing to grant the master contract vacation schedule but took the position that the employee's service should date from the time Ronnie's Bar took over, which would mean that, until Ronnie's Bar had been in business for five years, no employee would be entitled to three weeks annual paid vacation. Eventually a number of the employees went on strike on October 8, 1961, one of the strikers being a waitress who had worked over five years in the restaurant.

On October 17, 1961, Ronnie's Bar filed a petition with the Pennsylvania Labor Relations Board (Board) requesting the Board to certify the name of the representative to be designated as the collective bargaining representative for its employees pursuant to Section 7 of the Pennsylvania Labor Relations Act.[2] A short time later, the Union filed unfair labor practice charges against Ronnie's Bar.

After hearings, the Board dismissed the unfair labor practice charges and ordered that an election be held on February 1, 1962, by secret ballot, of those waitresses on Ronnie's Bar payroll as of October 17, 1961 (the date of the petition) to determine who should be the collective bargaining agent for the bargaining unit determined by the Board to be comprised of waiters and waitresses.

The Board's order listed the names of six waitresses as eligible to vote. Three of the named waitresses were strikers, two were replacements for the strikers and the remaining waitress had been em-

---

[2] Act of June 1, 1937, P. L. 1168, as amended, 43 P.S. §211.7.

ployed in the restaurant when Ronnie's Bar commenced operations.

A canvass of the ballots indicated that five out of the six employees named as eligible to vote had cast their ballots. In addition, a ballot had been cast by a waitress not on the eligibility list but who had replaced a waitress on the list who herself had been a replacement but had terminated her employment with Ronnie's Bar between the date of the petition and the election date.

The ballots of these employees on the eligibility list were challenged for cause by the parties and the ballot of the replacement for the terminated replacement worker (hereinafter "new waitress") was challenged by the Board's agent.

After a hearing on the challenges, the Board: (1) denied Ronnie's Bar's challenge of the ballots of two striking waitresses on the ground that, since these waitresses had obtained other "regular and substantially equivalent employment" at the date of the election, they were no longer "employe[s]" as defined in Section 3(d) of the Act, supra, and hence not eligible to vote; (2) denied the Union's challenge of the replacement waitress' ballot under the same section; (3) held that the new waitress was not eligible to vote because she was not an employee on the cut-off date for eligibility, i.e. the date of filing of the certification petition.

Ronnie's Bar petitioned the court below for review of the final certification order under Section 9(b) of the Act challenging: (a) the Board's determination that a bargaining unit comprised only of waitresses was appropriate; (b) the acceptance of the ballots of two striking waitresses who allegedly had obtained other "regular and substantially equivalent employment".

The court below was not asked to pass upon the challenge to the replacement waitress' ballot and Ronnie's Bar did not seek a review of the Board's de-

termination that the new waitress was not eligible to vote.

The Board, after hearing, had concluded that Therese Lipsitz and Gertrude Harris, two of the striking waitresses, were employees of Ronnie's Bar within the meaning of Section 3(d) of the Act and were eligible to vote at the election held on February 1, 1962. The challenge to their eligibility to vote was based on the contention that these two women had obtained "regular and substantially equivalent employment" and were not "employees" at the time of the election. The court below, reversing the Board, held that on the basis of the "uncontradicted testimony and the entire record" the two women had obtained "other regular and substantially equivalent" employment and were not employees under §3(d) of the Act.

On this appeal, the Board argues that (a) in the absence of a finding by the court that the Board's findings and conclusions were arbitrary and capricious, the court could not substitute its own findings and conclusions and (b) that the record substantiated the Board's findings and conclusions that these two women had not accepted *"other regular and substantially equivalent"* employment.

The scope of review of the determination and findings of the Pennsylvania Labor Relations Board has been well stated in *Pennsylvania Labor Relations Board v. Kaufman Department Stores, Inc.,* 345 Pa. 398, 399, 400, 29 A. 2d 90: "Upon judicial review, however, it is the duty of the court to determine whether the findings of the board are supported by the *substantial and legally credible evidence* required by the statute and whether the conclusions deduced therefrom are reasonable and not capricious. *All orders and decrees of legal tribunals, including those of administrative boards and commissions, must be supported by evidence sufficient to convince a reasonable mind to a fair*

*degree of certainty;* otherwise our vaunted system of justice would rest upon nothing higher than arbitrary edicts of its administrators. 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion': Consoliated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229." (Emphasis supplied.)

The court below was required to determine from an examination of the record before the Board whether its findings were supported by the quality of evidence statutorily required and whether the conclusions of the Board were reasonable and not capricious. A study of the opinion of the court below indicates that it set aside the findings of the Board that these two women had not obtained "other regular and substantially equivalent" employment on the ground that such findings lacked the necessary supporting evidence and, while the court did not so state specifically, it is evident that the court found the Board's conclusion in this respect unreasonable.

Section 3(d) of the Act provides: *"The term 'employe' shall include any employe, . . .* and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute, . . . *who has not obtained any other regular and substantially equivalent employment. . . ."* (emphasis supplied): Act of 1937, supra, 43 PS §211.3(d).

This Court in *Pennsylvania Labor Relations Board v. Rooney,* 389 Pa. 587, 591-592, 133 A. 2d 533, construing §3(d), supra, said: "The legislative intent was to protect those employes who left their employment during the strike or labor dispute. But it is also clear that *to preserve the status* which he once enjoyed, the employe must come forward with proof that he had not obtained '. . . other regular and substantially equivalent employment.' It is argued that

this burden should rest upon the employer; but this would impose a difficult if not impossible task. Obviously the person best qualified to prove the whereabouts of the employe and the place of employment during the strike is the striker himself. One of the given events having occurred, to fix his employe status, he must comply with the conjunctive condition, and must establish, in the words of the Act, section 3(d), that '[he] . . . has not obtained any other regular and substantially equivalent employment'. [citing a case]" (emphasis supplied).

In the case at bar, was there "substantial and legally credible evidence" produced before the Board that these two women had not obtained "other regular and substantially equivalent employment"?

It is undisputed upon this record that both these women, after commencement of the strike, did secure other employment in which their basic pay and the number of hours worked were substantially the same as at Ronnie's Bar. Despite such testimony, the Board found that they had not obtained "other regular and substantially equivalent employment". An examination of the opinion of the Board reveals its rationale in so finding: (a) interpreting the word "regular" in the statute as exclusive of the idea of that which is "occasional, *accidental,* incidental or casual", the Board, relying in large measure on testimony of the two women that their new employment was only on a temporary basis[3] and that they *intended* to return to Ronnie's Bar, concluded that "[t]heir *regular* job was that which they temporarily ceased working at, not the one they *incidentally* secured in order to maintain themselves while continuing the strike at their regular Employer" and (b) that "[w]aitresses who

---

[3] The testimony of the new employers of these two women that they intended to keep them as permanent employees was rejected by the Board.

worked over the years in the same restaurant and whose earnings are primarily based on the amount of tips received could not help but build up a special following among the customers which in turn creates a vested interest in terms of security and economic advantages" and "[t]hus, any other casual or interim job could not be considered as substantially equivalent even though the basic wages and hours are the same". Is such rationale supportable either factually or legally?

The National Labor Relations Act of 1935[4] and our Act, supra, declared, respectively, a National policy and a Commonwealth policy of encouraging collective bargaining, protecting the full freedom of association of workers and barring any interference, restraint or coercion by employers which would interfere with the practice and procedure of collective bargaining. To better effectuate the policy of the acts, national and state, labor relations boards were established to provide a swift and expert determination of any issues within the purview of the acts. Broadly speaking these acts had two aims: first, to ensure selection of exclusive bargaining representatives for appropriate units of employees; second, to provide remedies for the unfair labor practices specified therein committed by either an employer or a labor organization, all of which practices fall into the broad category of interfering with the collective bargaining process.

We are commanded by §2(d) of our Act to liberally construe the Act for the accomplishment of its purposes as set forth above and, since our Act is patterned after the National Act, decisions under the National Act may be looked to for guidance in interpreting similar provisions in our Act: *Pennsylvania Labor Relations Board v. Loose,* 402 Pa. 620, 623, 168 A. 2d 323.

The National Labor Relations Act (29 U.S.C. §152(3)) provides in pertinent part: "The term 'em-

---

[4] 29 U.S.C. §151 et seq.

ployee' . . . shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, *and who has not obtained any other regular and substantially equivalent employment."* (emphasis supplied) The United States Supreme Court in *Phelps Dodge Corporation v. National Labor Relations Board,* 313 U.S. 177, 61 S. Ct. 845, while rejecting the view that the above quoted section of the statute qualifies another section of the same statute dealing with the "reinstatement of employees", stated: "The reference . . . to workers who have 'obtained regular and substantially equivalent employment' has a role consonant with some purposes of the Act. . . . In determining whether an employer has refused to bargain collectively with the representatives of 'his empolyees' . . . it is of course essential to determine who constitutes 'his employees'. One aspect of this is covered by §9(b) which provides for determination of the appropriate bargaining unit. And once the unit is selected, the reference in §2(3) to workers who have obtained equivalent employment comes into operation in determining who shall be treated as employees within the unit.": (313 U.S. at page 192, 61 S. Ct. at pages 851, 852).

In *National Labor Relations Board v. Carlisle Lumber Co.,* 99 F. 2d 533, the Court of Appeals for the 9th Circuit, stated (p. 539) : "The word 'regular' . . ., means substantially the same amount of work from point of time, as the employee had received from respondent. The words 'substantially equivalent' cover many things, including rate of pay, hours, working conditions, location of the work, kind of work, and seniority rights, if any". In the case at bar, the Board equated *regularity* of employment with *permanence of* employment and emphasized the *expressed intent* of both women to return to Ronnie's Bar as *controlling*

on the question of whether these women had obtained "regular" employment. In this respect, the Board clearly erred. The Court of Appeals for the 3rd Circuit in *National Labor Relations Board v. Botany Worsted Mills,* 106 F. 2d 263, 269, effectively answered this contention: "The only other difference between the two jobs disclosed by the record appears in [the empolyee's] preference. He wishes to resume employment with petitioner. The Board seems to feel this fact is 'partly' controlling, . . . We question this . . . it seems to us that *lack of equivalence must be disclosed in realms more material than the mind and sensibility of one of the individuals concerned."* (emphasis supplied). If the *intent* expressed by these two women is to determine whether the employment they have obtained is *regular employment* then the status of such women as employees under §3(d) is determinable on rather a nebulous basis. In our view, such was not the legislative intent or purpose. Whether these women are eligible as employees under §3(d) should depend on objective, rather than subjective, factors if the statute is to have meaning. The emphasis placed by the Board on the expressed intent of these two women to eventually return to work at Ronnie's Bar clearly indicates that the Board deemed the expression of such intent controlling in large measure in concluding that these two women had not obtained "regular employment"; in so doing, the Board clearly erred.

The Board further erred in the importance which it attached to the so-called "tenure" of these two women, amounting, in the words of the Board, to a "vested interest" in employment by Ronnie's Bar. The Board reasoned that by virtue of long employment with Ronnie's Bar these two women had built up a following among the customers of Ronnie's Bar which resulted in their receipt of more generous tips than they would receive in another restaurant where they had worked

but a comparatively short period of time. The difficulty with the Board's conclusion is that it finds no support on this record; there is not a scintilla of evidence as to the amount of tips received in Ronnie's Bar as compared with the amount of tips received in the new restaurant. With the same lack of evidence the Board well might have concluded that a waitress could take her following with her from the old to the new job and be no worse off economically. In its conclusion that the new employment was not equivalent to the old employment because of the difference in tips received by the two waitresses the Board erred simply because there was no evidence on that subject whatsoever.

In our view, the Board erred in two respects: first, in the emphasis which the Board placed on the expressed intent of these two women to return to work at Ronnie's Bar and, second, in the Board's conclusions that, because of the differential in tips received, the new employment was not the equivalent of the old employment. The court below was, therefore, correct in overruling the Board.

However, as a practical matter, it may well be that the tips received or obtained by these two women in their *new* employment in a *new* restaurant differ so greatly from the tips received or obtained as the result of long acquaintance with the customers in the *old* employment in the *old* restaurant so as to render the new employment not the substantial equivalent of the old employment within the terms and purview of §3(d). In fairness to these two women they should be granted an opportunity to prove, if they can, that their remuneration by way of tips in the *new* restaurant is so greatly different than that in the *old* restaurant that the new employment cannot be considered the equivalent of employment in the old restaurant. To that end this matter should be remanded to the Board

for the production of testimony, if any there be, to show that such differential in tips renders the new employment not the substantial equivalent of the old employment before a final determination be made of the eligibility of these women to have a say in the selection of a collective bargaining representative under §3(d) of the Act.

Order of the court below reversed and the matter remanded for proceedings not inconsistent with the views expressed in this opinion.

---

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I join in that portion of the majority's opinion and holding that: "The Board further erred in the importance which it attached to the so-called 'tenure' of these two women, amounting, in the words of the Board, to a 'vested interest' in employment by Ronnie's Bar. The Board reasoned that by virtue of long employment with Ronnie's Bar these two women had built up a following among the customers of Ronnie's Bar which resulted in their receipt of more generous tips than they would receive in another restaurant where they had worked but a comparatively short period of time. *The difficulty with the Board's conclusion is that it finds no support on this record; there is not a scintilla of evidence as to the amount of tips received in Ronnie's Bar as compared with the amount of tips received in the new restaurant.* . . .

"In our view, the Board erred in two respects: first, in the emphasis which the Board placed on the expressed intent of these two women to return to work at Ronnie's Bar and, second, in the Board's conclusions that, because of the differential in tips received, the new employment was not the equivalent of the old

employment. *The court below was, therefore, correct in overruling the Board.*" (Emphasis supplied.)

With this sound conclusion, I am fully in accord. I am unable, therefore, to concur with the majority's failure to affirm the court below which did reverse the Board. I disagree with the majority's decision to remand this matter for the purpose of exploring whether the tips were more generous in the new or old place of employment. Remanding this case "to the Board for the production of [such] testimony, if any there be", is, in my view, uncalled for and unnecessary. This venture into a search for such theoretical evidence is an unwarranted basis for further delay and expense, particularly since no party in interest offered to produce any such evidence or requested further hearing.

I dissent and would affirm the court below.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I dissent. Economic, financial and employment conditions in July, 1963, are very different from those which existed on October 17, 1961. This case should be decided *on the record* of over 275 pages in length. Under these facts and circumstances and on the basis of the record, it is clear that the Order of the lower Court should be affirmed.

Mr. Justice EAGEN joins in this dissenting opinion.