Borough of Wilkinsburg, Appellant *v.* Sanitation Department of the Borough of Wilkinsburg, Appellee.

Pennsylvania Labor Relations Board, Appellant, *v.* Employees' Committee of the Wilkinsburg Sanitation Department, Appellee,

Argued November 7, 1974, before President Judge BOWMAN and Judges CRUMLISH, JR., MENCER, ROGERS and BLATT. Judges KRAMER and WILKINSON, JR. did not participate.

*Robert L. Potter,* with him *Jonathan L. Alder, Reed, Smith, Shaw & McClay,* and, of counsel, *James M. Mc-Elfish,* Borough Solicitor, for appellant Borough.

*Raymond W. Cromer,* with him *James F. Wildeman* and *James L. Crawford* for appellant, Board.

*Byrd R. Brown,* with him *Doris A. Smith,* for appellee.

OPINION OF JUDGE MENCER, January 8, 1975:

We are confronted in these appeals with further important questions relative to the scope of bargaining requirements of the Public Employe Relations Act, Act of July 23, 1970, P. L. 563, *as amended,* 43 P. S. §1101.101 et seq. (PERA).

The Employees' Committee of the Wilkinsburg Sanitation Department (Committee), on March 29, 1972, filed a charge of unfair labor practices with the Pennsylvania Labor Relations Board (Labor Board) against the Borough of Wilkinsburg (Borough). It was asserted by the Committee that the Borough had engaged in unfair labor practices in violation of Section 1201, subsection (a), clauses (3), (5), and (9), of PERA.[1] On April 12, 1972, the Board issued a complaint based upon these charges and set a date for a hearing. Following two days of testimony, the Board entered a Nisi Decision and Order on September 28, 1972.

---

1. 43 P.S. §1101.1201(a) (3), (5), (9). These pertinent portions of Section 1201 provide as follows:

"(a) Public employers, their agents or representatives are prohibited from:

. . . .

"(3) Discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employe organization.

. . . .

"(5) Refusing to bargain collectively in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative.

. . . .

"(9) Refusing to comply with the requirements of 'meet and discuss.' "

The Board conceded that the Borough had not committed the unfair labor practices charged by the Committee. Exceptions were filed by the Committee and denied on February 1, 1973 by a final order of the Board, from which an appeal was taken to the Court of Common Pleas of Allegheny County. Without the taking of additional evidence, that court entered an order on April 4, 1974 by which it reversed that part of the Board's order dismissing charges of violation of Section 1201(a)(5) of PERA and sustained that part of the Board's order dismissing charges of violation of Section 1201(a)(3) and (9).

On May 1, 1974, the Borough filed an appeal in this Court from that portion of the order of April 4, 1974 which reversed the Labor Board's dismissal of charges of a violation of Section 1201(a)(5) of PERA, and two days later, May 3, 1974, the Labor Board filed an appeal from the same portion of said order. No cross appeal has been filed by the Committee from the order under challenge here; therefore, these appeals only raise for our determination the correctness of the lower court's reversal of the Labor Board's conclusion of law that the Borough had not violated Section 1201(a)(5) of PERA.

In order to facilitate an understanding of the factual setting so important to a legal resolution of these appeals, we report here the findings of fact made by the Board, which our examination of the record discloses are supported by substantial and legally credible evidence:

"1. The Borough of Wilkinsburg is a political subdivision of the Commonwealth of Pennsylvania with its principal office at 605 Ross Avenue, Wilkinsburg, Pennsylvania.

"2. The Employees' Committee of the Wilkinsburg Sanitation Department is an employe organization which exists for the purpose, in whole or in part,

of dealing with employers concerning grievances, employer-employe disputes, wages, rates of pay, hours of employment, and other conditions of work with its principal office at 605 Ross Avenue, Wilkinsburg, Pennsylvania.

"3. The employes of the Sanitation Department of the Borough of Wilkinsburg negotiated with said borough for a number of years prior to 1971 and as a result thereof, reached agreements on wages and other conditions of work.

"4. On January 11, 1971, the Borough of Wilkinsburg and the Employees' Committee of the Wilkinsburg Sanitation Department, entered into a collective bargaining agreement, which agreement by its terms expired on December 31, 1971.

"5. Pursuant to a Joint Request for Certification at Case No. PERA-R-1165-W, the Board on July 1, 1971, certified the Employees' Committee of the Wilkinsburg Sanitation Department, as the exclusive representative of the employes of the Borough of Wilkinsburg, in a subdivision of the employer unit, comprised, with certain exclusions, of employes of the Sanitation Department for the purpose of collective bargaining with respect to wages, hours and terms and conditions of employment.

"6. Representatives of the Borough of Wilkinsburg and the Employees' Committee of the Wilkinsburg Sanitation Department met on December 9, 1971, for the purpose of negotiating a new contract, at which time the Employees' Committee presented their contract demands consisting, inter alia, of a $2,500 annual wage increase, i.e. a 25% wage increase for each employe, whereupon, the borough counter-offered a 5.5% wage increase for each employe.

"7. Thereafter, representatives of the Borough of Wilkinsburg and the Employees' Committee, rep-

resenting employes of the Sanitation Department of said borough, met for collective bargaining purposes on January 7, January 19, January 22, January 31, February 23, February 28, March 6, March 15 and March 26, 1972.

"8. At the meeting on January 7, 1972, after bargaining, the Employees' Committee accepted the 5.5% wage increase offered by the borough, but suggested an increase of four (4) hours over the forty-eight (48) hour incentive plan then in existence, which suggestion would with the 5.5% wage increase, result in a 10% increase in annual income for each employe.

"9. At said meeting on January 7, 1972, the borough announced an improved plan for hospitalization for all employes of the borough, which plan was one of the demands of the Employees' Committee, and the borough then compared its costs in operating its Sanitation Department with the costs of the Borough of Mount Lebanon which engaged a private contractor to pick up its garbage and rubbish.

"10. At said meeting on January 7, 1972, the borough's representatives indicated to the Employees' Committee, that the borough was thinking of engaging an independent contractor to haul its garbage and rubbish.

"11. A state mediator attended the meeting of January 19, 1972, however, there was no change in the positions of either side.

"12. At the meeting of January 22, 1972, pursuant to the request of the Employees' Committee, three (3) members of the Borough Council, who comprised the Council's Sanitation Committee also attended said meeting.

"13. At said meeting of January 22, 1972, the Employees' Committee again presented their demands and stated their position and in addition, a discus-

sion ensued regarding the respective costs of garbage collection systems in other municipalities and the borough again, through its counsel, mentioned that it was considering a private contractor.

"14. Following the meeting of January 22, 1972, the Administrative Assistant for the borough prepared figures showing the cost of the borough's garbage and rubbish collection compared with other municipalities and said figures indicated that the borough's costs were substantially higher than other comparable municipalities and this subject was discussed at the next meeting on January 31, 1972.

"15. At the meeting on January 31, 1972, neither side changed its position and the main subject discussed was the borough's intention of submitting bids to private contractors to haul its rubbish and garbage.

"16. On February 14, 1972, the Borough Council duly authorized the advertising for bids of private contractors for the collection of garbage and rubbish in the borough, according to specifications.

"17. The meeting on February 23, 1972, was with members of the Borough Council, and the Employees' Committee presented their position and contract demands directly to said Councilmen.

"18. On February 28, 1972, at a Council meeting, the Borough Council opened the bids received from the private contractors to perform the work on the basis of the specifications, and thereafter a business report was run on the three lowest bidders by the borough's Administrative Assistant who reported the results of said report to the Borough Council.

"19. At the meeting of March 6, 1972, the negotiating parties discussed the bids that had been received by the borough, the fact that the low bids required a change of thinking on the part of both sides and that the Council was considering, but had not

yet decided to make an award to one of the private contractors.

"20. At the meeting of March 6, 1972, the Employees' Committee requested the borough to place two of their older employes in another department so they could receive their pensions in the event the borough awarded the work of the Sanitation Department to a private contractor, whereupon following the meeting members of Council met and decided that if such contingency occurred, they would give first priority to the employes of the Sanitation Department to fill any vacancies in the Department of Public Works.

"21. At the meeting of March 15, 1972, the borough again discussed the low bids received and also discussed changes in the type of service it intended to provide, within the framework of the specifications submitted to bid; the Employees' Committee revised their demands and the borough agreed to analyze the new figures and compare costs.

"22. At the meeting of March 15, 1972, the Employees' Committee refused to agree to a weekly curbside pick-up of rubbish as provided in the job specifications submitted to bid.

"23. At the meeting of March 15, 1972, the borough suggested that the hours of work per week be reduced from forty-eight (48) to forty (40), however the Employees' Committee rejected said suggestion.

"24. The borough representatives told the Employee's Committee at one of the meetings that the borough could not afford the 'Cadillac' service presently provided to the community in the collection of rubbish and garbage and further that the borough was interested in providing service within the framework of the specifications bid upon, and the borough then suggested at the March 15th meeting that the Employees' Committee reduce the cost of operation

somewhere between the lowest and next to the lowest bid.

"25.   At the meetings in March, 1972, as well as in prior meetings, considerable time was consumed in discussing the cost of operating the Wilkinsburg Sanitation Department.

"26.   The following figures represent the cost of operating the Sanitation Department of the Borough of Wilkinsburg for the years of 1968 through 1971 and the estimated cost for the year of 1972:

| | |
|---|---|
| 1968 ........................ | $222,764.95 |
| 1969 ........................ | 268,960.05 |
| 1970 ........................ | 305,307.74 |
| 1971 ........................ | 355,507.21 |
| 1972   (estimated) ............ | 372,101.41 |

"27.   Pursuant to collective bargaining and agreements entered into between the borough and the Employees' Committee of the Wilkinsburg Sanitation Department for the years 1968 through 1971, the following wage increases were agreed upon and paid:

| Date | Adjustment | Driver | Helper |
|---|---|---|---|
| Jan. 5, 1968 | 6% | $6,084 | $5,664 |
| Aug. 12, 1968 | Special Increase to $2.76 per hr. and to $2.44 per hr. | | |
| Aug. 26, 1968 | Special Increase of $16.66 per mo. for all employes | | |
| Jan. 3, 1969 | 6% | $6,449 | $6,004 |
| Sept. 8, 1969 | Special Increase | $6,649 | $6,204 |
| Jan. 3, 1970 | General Increase | $7,600 | $7,100 |
| Aug. 10, 1970 | Special Increases of not less than $150 but not more than $200 for all employes. | | |
| Jan. 3, 1971 | Contract | $10,008 | $9,310 |

"28.   Subsequent to the March 15, 1972 meeting the Administrative Assistant of the borough pre-

pared a document reflecting the budget figure for 1972 for the Sanitation Department, the amount of the bids from the various bidders, the amount of Council's offer to the Sanitation Department and the latter's offer to Council and said document was presented to the Employees' Committee prior to the meeting of March 26, 1972.

"29. At the meeting of March 26, 1972, the Employees' Committee again refused to perform the weekly pick-up services at curbside, as provided in the job specifications submitted to bid.

"30. At the meeting on March 26, 1972, the Employees' Committee again revised their demands, however, as calculated by the borough, said demands, if accepted, would cost the borough the amount of $314,000 per annum, plus cost of living increases in the second and third years of the contract, compared to the cost in awarding the private contract to Clark Sanitation Service, Inc. amounting to $234,000.00 per annum.

"31. During one of the negotiating meetings in March, 1972, Councilman Byrnes stated that in his opinion, it was the responsibility of Council to the community, to consider seriously the significant disparity in costs between the lowest bidder and the demands of the Employees' Committee, and that if the negotiating parties could not arrive at a cost figure at least between the two lowest bids, then Council should think seriously of awarding the contract to the lowest bidder and eliminate the Sanitation Department.

"32. Toward the end of the meeting on March 26, 1972, a Councilman for the borough specifically asked the Employees' Committee, "Is this the lowest you will go, is this final?" and said Committee responded "yes", this was it.

"33. At the conclusion of the meeting on March 26, 1972, there was no agreement regarding any further meetings, however, the borough agreed to inform the Employees' Committee of its decision.

"34. Following the negotiations at the meeting on March 26, 1972, Council members of the borough decided that if the Employees' Committee did not change their demands it was inevitable that they would award the contract the following evening to the lowest bidder.

"35. Immediately prior to opening the Borough Council meeting on March 27, 1972, the President of Council asked the Chairman of the Employees' Committee if there was any change in the Sanitation Department's position or demands and the answer was "No", whereupon the President of Council informed said Chairman of Council's decision to award the contract.

"36. Upon being informed of Council's decision to award the contract to a private hauler, the Chairman of the Employees' Committee made no request for further meetings, but stated that he intended to take legal proceedings against the borough.

"37. Following the aforesaid conversation with the Chairman of the Employees' Committee, the President of Council informed each Council member that there was no change in the Sanitation Department's position or demands.

"38. Council for the Borough of Wilkinsburg awarded the contract to the lowest bidder, to-wit, Clark Sanitation Service, Inc. on March 27, 1972, at a public meeting, and a contract was entered into dated April 1, 1972, for a period of three (3) years at an annual cost of $234,000."

In *Pennsylvania Labor Relations Board v. Kaufmann Department Stores, Inc.*, 345 Pa. 398, 29 A. 2d 90 (1942),

the Supreme Court held that the scope of appellate review is limited to a determination of whether the findings of the Labor Board are supported by substantial and legally credible evidence and whether the conclusions deduced therefrom are reasonable and not capricious, arbitrary or illegal. In this regard, *Kaufmann* was interpreting language identical with that which we have here. Sections 1501 and 1502 of PERA, 43 P.S. §§1101.1501-02, provide, *inter alia,* that findings of the board as to the facts, if supported by substantial and legally credible evidence, shall be conclusive.

Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Ronnie's Bar, Inc. v. Pennsylvania Labor Relations Board,* 411 Pa. 459, 192 A. 2d 664 (1963). *See A. P. Weaver and Sons v. Sanitary Water Board,* 3 Pa. Commonwealth Ct. 499, 284 A. 2d 515 (1971).

This restrictive standard of review proved to be the first shoal upon which the lower court became grounded on its errant voyage across the unsettled PERA seas.

The lower court refused to accept the findings of the Labor Board that pertained to (1) the Committee's knowledge of the bid specifications which the Borough had advertised in order to receive bids from private contractors relative to contracting out its refuse collection work and (2) the negotiations between the Borough and the Committee being conducted on the basis of the bid specifications.

The record reveals that the contract between the Borough and the Committee, which expired December 31, 1971, had provided for a weekly pickup of all common rubbish at each residence, apartment house, or public school in the Borough and a biannual pickup of heavy trash. Certain public institutions were provided twice-a-week service. The specifications under which the Borough solicited bids provided for a weekly pickup of common rubbish but limited to three cans per week per residence

within 150 feet of the street. Apartment houses and schools were similarly restricted, but the heavy trash pickup was to be increased from biannually to weekly at curbside.

Our examination of the record discloses that there is direct evidence that is both substantial and legally credible indicating that the Committee was aware of and familiar with these differences in the service to be performed under the bid specifications. The lower court was in error in concluding that the record did not support the Labor Board's findings that the Committee was aware of the bid specifications and that they were not considered in the negotiations between the Borough and the Committee.

Prior to PERA, it was clear that a municipality could do away with a position of employment originally created by it, although the effect was to remove an employe from his position, when done in good faith for reasons of economy or because the work was no longer required. The employe had no voice in the elimination of a position for reasons of economy or efficiency. The abolishing of a position was a matter solely for the judgment of the governmental authority in whom the power to eliminate the office was vested. *Gaul v. Philadelphia,* 384 Pa. 494, 121 A. 2d 103 (1956).

In *Pennsylvania Labor Relations Board v. State College Area School Board,* 9 Pa. Commonwealth Ct. 229, 306 A. 2d 404 (1973), we made an extensive analysis of the scope of bargaining requirements of Sections 701, 702 and 703 or PERA, 43 P.S. §§1101.701-03.[2] We con-

---

2. These three sections read as follows:

"Section 701 [43 P.S. §1101.701 Matters subject to bargaining]. Collective bargaining is the performance of the mutual obligation of the public employer and the representative of the public employes to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an

cluded there that since PERA deals with the public sector of labor relations and has as an integral part of its plan the limiting provisions to collective bargaining of Sections 702 and 703, it is unique and lends itself more to interpretation than to comparisons. Consequently, the myriad of National Labor Relations Board cases and federal decisions dealing with statutes that *do not contain such limitations to collective bargaining,* and generally dealing in the private sector of labor relations, are of little precedent or real assistance, *at least in the interpretation of Section 701.*

Therefore, we must conclude that the lower court again erred in its determination that "[t]he conclusion and rationale of [Fiberboard Paper Products Corporation v. National Labor Relations Board, 379 U.S. 203, 85 S. Ct. 398, 13 L. Ed. 2d 233 (1964)] must be the guid-

agreement or any question arising thereunder and the execution of a written contract incorporating any agreement reached but such obligation does not compel either party to agree to a proposal or require the making of a concession.

"Section 702 [43 P.S. §1101.702 Matters not subject to bargaining]. Public employers shall not be required to bargain over matters of inherent managerial policy, which shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organization structure and selection and direction of personnel. Public employers, however, shall be required to meet and discuss on policy matters affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by public employe representatives.

"Section 703 [43 P.S. §1101.703 Implementation of provisions *in violation of,* or *inconsistent with* statutes or home rule charters]. The parties to the collective bargaining process shall not effect or implement a provision in a collective bargaining agreement if the implementation of that provision would be in violation of, or inconsistent with, or in conflict with any statute or statutes enacted by the General Assembly of the Commonwealth of Pennsylvania or the provisions of municipal home rule charters."

ing light in this Court's resolution of a similar controversy under Act 195 [PERA]." Not only do we not comprehend, in view of the intertwining provisions of Sections 701, 702 and 703 of PERA not present in *Fibreboard*, why *Fibreboard* "must be the guiding light," but, more significantly, we cannot understand how the lower court concluded that the factual situation here could be described as "a similar controversy" to the factual situation of *Fibreboard*.[3]

However, suffice it to say, although we do not apply *Fibreboard* here, that our careful reading of this record convinces us that the Labor Board reached a correct conclusion that, "based on the Fibreboard opinion, ... even under the National Labor Relations Act, the Supreme Court would have approved of the facts before us as the proper method of submitting a mandatory subject of collective bargaining to the mediatory influence of negotiations." The Labor Board's determination that the Borough bargained with the Committee in good faith is legally supported by this record.

Finally, we must conclude that the lower court erred in holding that under PERA the Borough had a duty to bargain collectively with the Committee on the question of effecting substantial savings by contracting with a private contractor for work previously performed by members of the public employe bargaining unit.

As we stated in *Pennsylvania Labor Relations Board v. State College Area School District, supra,* a careful reading of Sections 701 and 702 of PERA discloses that the Legislature designated whether items were (a) bar-

---

3. It would appear that the Federal Government does not consider *Fibreboard* applicable in bargaining with federal public employes. *See* §12(b) of Executive Order No. 11491, 34 Fed. Reg. 17605 (Oct. 31, 1969); *Tidewater Virginia Federal Employees Metal Trades Council v. Naval Public Works Center, Norfolk, Virginia* (Federal Labor Relations Council, No. 71A-56), Government Employee Relations Reporter RF-67, 21:7093 (July 23, 1973).

gainable items or (b) not bargainable items but subject to a "meet and discuss" requirement.

"Section 701 expressly requires the public employer to participate in good faith in collective bargaining with respect to wages, hours and other terms and conditions of employment. However, we are unable to stop here as it is just not a question of whether the item involves wages, hours and other terms and conditions of employment. Assuming that a proposed item for collective bargaining does involve such matters, the further and controlling question must be asked and answered as to whether the item also involves matters of inherent managerial policy and, if the answer to this question is in the affirmative, the item is not bargainable under the provisions of Section 702.

"Section 702 provides that public employers shall not be required to bargain as to any matter of inherent managerial policy but, if the policy matter affects wages, hours and terms and conditions of employment as well as the impact thereon, upon request, the public employers must meet and discuss such policy matter. However, the controlling provision, not to be overlooked, is that under Section 702 a public employer is not required to bargain on any policy matter notwithstanding the effect or impact that it may have on wages, hours, and terms and conditions of employment." 9 Pa. Commonwealth Ct. at 238, 306 A. 2d at 409-10 (emphasis and footnote omitted).

Again, we must address the question of what is encompassed by the phrase, "matters of inherent managerial policy." In the instant case, it could be argued that the elimination of a position of employment resulting in an employe's loss of employment, when done in good faith for reasons of economy or efficiency, is not only a matter of inherent managerial policy but is simply a question of whether there is to be employment available

for the employe. Job availability or job security may not be a condition of employment as that term is used in Sections 701 and 702 of PERA. It may not be the imposing of conditions on employment but solely a question of whether there is to be a job which would necessitate a jobholder.

However, we have no doubt that the decision to eliminate a position of employment, when done in good faith for reasons of economy and efficiency, if covered by the scope of bargaining requirements of PERA, is surely a matter of inherent managerial policy. Section 702 states that the "functions and programs of the public employer, ... its overall budget, ... [and] organizational structure" are areas of discretion or policy included in the phrase, "matters of inherent managerial policy."

Certainly the decision made here by the Borough that, because of budget considerations and the desire to effectuate a substantial economy in the collection of refuse, it would change its organizational structure and contract with a private contractor to do the work incident to such a collection and done previously by Borough employes comes within the inclusionary language used in Section 702. It was a matter that belonged to the Borough Council as a natural prerogative or essential element of the right to manage the affairs of the Borough. It was a decision that determined the policy and direction that the Borough would follow in the collection of refuse. "Inherent managerial policy" is a broad term and includes the right to manage and to make decisions that determine policy.

Assuming that the exercise in this case by the Borough of its inherent managerial policy in deciding to contract with a private contractor for refuse collection affected or had an impact upon the wages, hours, and terms and conditions of employment of the Committee and those it represents, then the Borough had the statu-

tory obligation, under Section 702, to meet and discuss the matter, if so requested, with the Committee.

"Meet and discuss" is defined in Section 301 (17) of PERA, 43 P.S. §1101.301 (17), as follows:

"(17) 'Meet and discuss' means the obligation of a public employer upon request to meet at reasonable times and discuss recommendations submitted by representatives of public employes: Provided, That any decisions or determinations on matters so discussed shall remain with the public employer and be deemed final on any issue or issues raised."

Here, there were at least six meetings between the Borough and the Committee where the parties discussed the bids received by the Borough and the likelihood that the Borough would decide to contract with a private contractor for the collection of refuse in order to effectuate substantial savings to the Borough taxpayers.

More significantly for purposes of this appeal, the Labor Board and the lower court concluded that on this record the Borough was not in violation of the "meet and discuss" requirement of Section 1201 (a) (9) of PERA. This conclusion by the lower court was not appealed by the Committee. Our study of the record leads us to the same conclusion.

In summary, we hold that the findings of fact made by the Labor Board were supported by substantial and legally credible evidence. Also, we hold the lower court erred in ruling that under the provisions of PERA the Borough has a duty to bargain collectively with the Committee relative to a decision to effectuate substantial savings by contracting with a private contractor for the collection of refuse in the Borough when previously such collection work was performed by Borough employes represented by the Committee. Further, that decision was one of inherent managerial policy and, at most, was a "meet and discuss" item under Section 702 of PERA, and

the Borough, on this record, was in compliance with this statutory requirement.

Accordingly, for the reasons set forth herein, that part of the April 4, 1974 order of the Court of Common Pleas of Allegheny County which reversed that part of the order of the Pennsylvania Labor Relations Board dismissing charges of violation of Section 1201 (a) (5) of the Pennsylvania Public Employe Act, brought by the Committee of the Wilkinsburg Sanitation Department against the Borough of Wilkinsburg, is reversed.