Nationwide Mutual Insurance Company, Appellant, *v.* Commonwealth of Pennsylvania, Herbert S. Denenberg, Insurance Commissioner, and Insurance Department of Pennsylvania, Appellees.

Argued March 5, 1974, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Francis J. O'Gorman, Jr.*, with him *Robert L. Rubendall* and, of counsel, *Metzger, Hafer, Keefer, Thomas* and *Wood*, for appellant.

*Andrew F. Giffin*, Assistant Attorney General, with him *Barton Isenberg*, Assistant Attorney General, for appellees.

OPINION BY JUDGE KRAMER, August 12, 1974:

This is an appeal filed by Nationwide Mutual Insurance Company (Nationwide) from a "final determination" (order), wherein Herbert S. Denenberg, Insurance Commissioner of the Insurance Department of the Commonwealth of Pennsylvania (Commissioner), disapproved Nationwide's rate filing for private passenger automobile premiums to be charged for such insurance coverage in the Commonwealth of Pennsylvania. The filing was made on April 25, 1973 with a request for approval of the proposed rates to become effective July 1, 1973. The filing was made under the provisions of The Casualty and Surety Rate Regulatory Act (Act), Act of June 11, 1947, P. L. 538, 40 P.S. §1181 et seq. The filing proposed certain increases in the premiums for certain classes of coverage and

decreases in others.[1] The filing proposed a net increase in premiums of 9.2% for some 573,000 Pennsylvania policyholders which represented an increase of $7,065,-000 in additional revenues for Nationwide. In addition to the required statistical data contained in the "filing memorandum" submitted with the rate filing, Nationwide supplied all of the additional information requested by the Commissioner. A public hearing was held on August 31, 1973 at which testimony was received from witnesses for Nationwide and the Insurance Commission. In addition, the Commissioner received testimony of representatives of the Citizens Committee for Ethical Insurance and the Consumers Education and Protective Association, the latter being via a telephonic message which was later confirmed by letter. Based upon the record thus made, the Commissioner issued his adjudication[2] from which this appeal was taken.

Initially we should note that this is the first insurance rate case involving automobile casualty insurance to reach our appellate courts,[3] and we have little

---

[1] The filing proposed increases and decreases as follows:

| Class of Coverage | Increase or Decrease |
|---|---|
|  | % |
| BI & PD | 19.7 |
| UMC | 30.0 |
| F. C. | (25.0) |
| Med. Pay. | (28.5) |
| Comp. | ( 0.1) |
| Collision | ( 2.4) |
|  |  |
| Combined | 9.2 |

[2] The original adjudication, as it is set forth in the printed record, is undated, but from the statement contained in the appeal filed by Nationwide, apparently it was intended to be dated September 20, 1973.

[3] Subsequent to the filing of this opinion it was brought to our attention that there is another appellate case which involved an

precedent at our disposal to help in our evaluation of the record of testimony submitted to the Commissioner. However, it is our observation that for such a highly technical and complex matter involving voluminous statistical data, the record of testimony appears to be inadequate to fully explain to anyone not a party to the proceedings the basis upon which the adjudication was made. It is also apparent that in his approach to insurance rate evaluation, the Commissioner relied more upon the statistical data than testimony describing, supporting or explaining it.

The record indicates that Nationwide made its last prior rate filing in 1969, which became effective January 25, 1970. Since that time, Nationwide has experienced underwriting losses in Pennsylvania as follows:

| | |
|---|---|
| 1969 ................ | $6,544,000 |
| 1970 ................ | 5,644,000 |
| 1971 ................ | 2,130,000 |
| 1972 ................ | 1,761,000 |
| 1973 (first six months) | 1,594,000 |

In determining underwriting losses, Nationwide followed the Insurance Department's guidelines for rate filings by including investment income on unearned premiums and loss reserves together with premiums received on the debit side and crediting against such income the dollars expended on claims payments and other expenses. Nationwide, however, did not include investment income derived from total company assets or surplus on the debit side in its determination of underwriting losses, which matter became an issue in this case.

---

association of automobile casualty insurance carriers. *See Insurance Department of Commonwealth v. Johnson*, 211 Pa. Superior Ct. 138, 238 A. 2d 23 (1968), *aff'd* 432 Pa. 543, 248 A. 2d 308 (1968). The holdings there are not contrary to our holdings here.

The Commissioner's adjudication is broken down into twelve categories (which will be discussed *infra*), each of which contains findings of fact and conclusions of law. Generally speaking, the Commissioner essentially concluded that the "filing resulted in an excessive rate request." In its appeal to this Court, Nationwide contends that the findings and conclusions are not supported by substantial evidence, that the disapproval of its rate filing is contrary to law because the Commissioner has not provided a reasonable margin for underwriting profit and lastly, that because of its proof of underwriting losses, the disapproval of the rate filing has violated its constitutional rights in that its property is being taken without due process of law.

Both the hearings before the Commissioner and the scope of review of this Court are controlled by Section 17 of the Act, 40 P.S. §1197, wherein it is provided that the provisions of the Administrative Agency Law, Act of June 4, 1945, P. L. 1388, as amended, 71 P.S. §1710.1 et seq. are applicable. With respect to our scope of review, Section 44 of the Administrative Agency Law, 71 P.S. §1710.44 states: "The court to which the appeal is taken shall hear the appeal without a jury on the record certified by the agency. After hearing, the court shall affirm the adjudication unless it shall find that the same is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of sections thirty-one to thirty-five inclusive of this act have been violated in the proceeding before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may set aside or modify it, in whole, or in part, or may remand the proceeding to the agency for

further disposition in accordance with the order of the court."

Although there is a sparsity of appellate court decisions in this Commonwealth on the rate-making process of the Insurance Department, we are aided by the excellent opinion of Judge WOODSIDE in *Pennsylvania Insurance Department v. Philadelphia*, 196 Pa. Superior Ct. 221, 173 A. 2d 811 (1961). Although that case involved the rate-making principles derived from a different statute which regulated fire insurance premiums, the general principles pronounced by Judge WOODSIDE are equally applicable here. On scope of review, the Court stated:

"Where an administrative agency is clothed with discretion in the discharge of its duty, the court will not interfere unless the record clearly establishes that there has been a violation of positive law or an arbitrary, capricious or unreasonable determination due to the absence of substantial evidence to support the findings. Mutual Supply Company Appeal, 366 Pa. 424, 426, 77 A. 2d 612 (1951); Blue Mountain T. & T. Co. v. Pa. P. U. C., 165 Pa. Superior Ct. 320, 326, 67 A. 2d 441 (1949); Insurance Company of North America v. Commissioner of Insurance, 327 Mass. 745, 101 N.E. 2d 335 (1951).

"As stated in Blumenschein v. Pittsburgh Housing Authority, 379 Pa. 566, 573, 109 A. 2d 331 (1954): '. . . it has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the

scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; judicial discretion may not be substituted for administrative discretion.' " 196 Pa. Superior Ct. at 237, 173 A. 2d at 819.

On the general subject, the Court said: "Insurance rate making is a technical, complicated and involved procedure carried on by trained men. It is not an exact science. Judgment based upon a thorough knowledge of the problem must be applied. Courts cannot abdicate their duty to examine the evidence and the adjudication, and to interpret and apply the law, but they must recognize the value of the judgment of an Insurance Commissioner who is specializing in the field of insurance and the efficacy of an adjudication supported by evidence of experts who devoted a lifetime of service to rate making." 196 Pa. Superior Ct. at 237-238, 173 A. 2d at 819.

With these sound guidelines and admonitions in mind, we have reviewed the record made in this case, applied the applicable law, and conclude that this matter must be remanded to the Commissioner. Our reasoning for this holding follows.

Initially, it is necessary to refer to several sections of the Act. Section 1 of the Act, 40 P.S. §1181, sets forth its purpose: "The purpose of this Act is to promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate or unfairly discriminatory. . . ." Section 3 of the Act, 40 P.S. §1183, sets forth the legislative directive in rate making. It states:

"All rates shall be made in accordance with the following provisions:

(a) Due consideration shall be given to past and prospective loss experience within and outside this Commonwealth, to physical hazards, to safety and loss prevention factors, to underwriting practice and judgment to the extent appropriate, to catastrophe hazards, if any, to a reasonable margin for underwriting profit and contingencies, to dividends, savings and unabsorbed premium deposits allowed or returned by insurers to their policyholders, members or subscribers, to past and prospective expenses both country wide and those specially applicable to this Commonwealth, and to all other relevant factors within and outside this Commonwealth;

. . . .

(d) Rates shall not be excessive, inadequate or unfairly discriminatory."

Section 4, 40 P.S. §1184, sets forth the duty of the Commissioner to review the rate filings as may be necessary to carry out the purpose of the Act. Section 5, 40 P.S. §1185, sets forth the duty of the Commissioner where he disapproves such a rate filing. That section states in pertinent part: "(a) Upon the review at any time by the Commissioner of a filing he shall, before issuing an order of disapproval, hold a hearing . . . and if, after such hearing, he finds that such filing or a part thereof does not meet the requirements of this Act, *he shall issue an order specifying in what respects he finds that it so fails,* and stating when, within a reasonable period thereafter, such filing or a part thereof shall be deemed no longer effective if the filing or a part thereof has become effective under the provisions of section four. . . ." (Emphasis added.)

It is obvious from a reading of the Act that, unlike the Public Utility Commission, the Insurance Commissioner does not fix rates. Under a strict reading of this statute, the Commissioner either approves or

disapproves a rate filing. However, Section 1 of the Act, 40 P.S. §1181 states that the Legislature intended that "[t]his Act shall be liberally interpreted to carry into effect its purposes as herein set forth." We believe that a liberal interpretation of the Act requires the Commissioner to do more than merely find fault with the rate filing so as to permit its disapproval. The Commissioner is under an obligation to specify any deficiencies in the rate filing so as to give the company some guidelines for future or amended filings. We find a clear legislative intent to regulate the casualty insurance business operating within this Commonwealth in such a manner so as to protect the public insofar as it is possible by providing insurance premiums low enough to maintain competition and prevent unreasonable profits and yet high enough to enable the insurers to provide the protection necessary to meet the claims against their insureds and the requirements of the insuring public. Unlike the rate-making principles of a public utility commission, which regulated companies without much competition, insurance regulatory bodies are intended to enhance competition between insurance companies for the benefit of the public. If the Commissioner merely disapproves a rate filing without specifying his reasons, he is not fulfilling his function under the Act, nor is he adequately protecting the public. Therefore, the adjudication of the Commissioner in this case does not adequately carry out the legislative intent of the Act.

We turn now to the adjudication to point out its inadequacies and to give some direction to the Commissioner for remand purposes. We will utilize the subject headings used by the Commissioner in his findings and conclusions.

"A. Rating Projection—Trending Technique." The Commissioner found that Nationwide used a trending

procedure which trended its losses for a twelve-month period beyond the effective date of the proposed filing. The Commissioner found that "normally" the trending of such losses is extended only to the end of the first rating period, which in this case was six months after the effective date of the proposed filing. The Commissioner concluded that this resulted in higher trended losses than would have otherwise resulted and therefore resulted in "an excessive rate request." The Commissioner made no finding on why the method "normally" used is the only legally acceptable method, or why Nationwide's trending was legally unacceptable. Furthermore, there is no way this Court can determine from the adjudication what dollar significance, if any, the difference between the Commissioner's and Nationwide's trending has on the rate filing. The whole purpose of the trending statistics is to project the effect of known changed factors as they apply to the test period statistics to permit reasonable adjustments for known factors applicable for future rates. If the Commissioner's position is based upon some rule or regulation of the Insurance Department, then clearly Nationwide was in error for using some other trending method, unless Nationwide undertook the burden to prove the need for such a different trend. If, however, there are no such rules or regulations, then the fact that a six-month trend period is "normally" acceptable for some other company does not necessarily mean that it is the only trend period acceptable for Nationwide. As a result, the Commissioner must state in his conclusions in what way Nationwide's trending is "inappropriate." In carrying out the true spirt of any regulatory agency, the Insurance Commissioner must set forth in his findings and conclusions sufficient directives from which the regulated company can either contest the adjudication on appeal, or as the statute provides, make a new filing which will comply with

the adjudication. The mere statement that the trending techniques used by Nationwide were inappropriate does not carry out the legislative intent.

"B. Rating Projection—Allocation for Taxes." Under this heading, the Commissioner makes a finding that "[n]ormally an allowance of 2.6% to 2.7% is made for Pennsylvania's 2.0% premium tax and related costs. . . ." Nationwide used 2.51% for taxes paid and made an adjustment by adding a percentage of allocated related costs and company-wide taxes applicable to its Pennsylvania operation. The Commissioner again found that the method used by Nationwide is not the "normally" accepted method and on that basis he concluded that Nationwide's allocation was "inappropriate" and "resulted in an excessive rate request." There can be no question that Nationwide should be permitted to recover in its rates all of its taxes which are applicable to its Pennsylvania operation. Whether this results in a higher percentage than is "normally" used by other companies is irrelevant, and therefore the Commissioner's findings and conclusions are inadequate. The Commissioner must determine that percentage which the record supports so that Nationwide may either appeal or amend its filing.

"C. Rating Projection—Allocation for Unallocated Loss." Here the Commissioner found that Nationwide trended its unallocated loss adjustment expenses as a function of the change in losses rather than its changes in expenses. The basis for the Commissioner's conclusion is that during the course of the hearings, Nationwide sent a letter and accompanying statistics showing the effect of the Federal Phase IV regulations as applied to its April 25, 1973 filing in this case. Its purpose was to show that its filing did not exceed the limits of the Federal regulations. The Commissioner seized upon this information in several of his many findings to conclude that Nationwide had

changed or amended its filing by virtue of these statistics submitted with its letter of August 6, 1973. The Commissioner was in error in this regard for that letter clearly concludes, "Even though the indications for each coverage are for greater increases or smaller reductions, *we are not proposing to revise the pending filing.*" (Emphasis added.) For some reason, the Commissioner completely overlooked Nationwide's declaration that it was not in any way attempting to revise its filing. It would appear then that there is not substantial evidence in the record to support either the findings or conclusions of the Commissioner with regard to allocation for unallocated loss.

"D. Rating Projection—Expense Loading." Here the Commissioner found that Nationwide had employed a 13.2% loading factor. In order to do this, once again, the Commissioner had to accept the August 6, 1973 letter and accompanying statistics involving Federal Phase IV regulations. As already noted, the Commissioner was in error in basing his adjudication on this letter and therefore, the Commissioner erred in his findings and conclusions.

With regard to the Federal Phase IV regulations, this Court has previously held that we have no jurisdiction to rule on the propriety of any Federal regulation under The Economic Stabilization Act of 1970 (P. L. 91-379, 84 Stat 779, as amended 12 U.S.C.A. §1904 note). *See Rankin v. Chester-Upland School District,* 11 Pa. Commonwealth Ct. 232, 312 A. 2d 605 (1973). As a result then, the 11.8% expense loading used by Nationwide in its filing appears to be acceptable to both the Commissioner and Nationwide.

"E. Rating Projection—Inclusion of Catastrophe Losses." Nationwide included in its filing an adjustment representing 25% of the approximately $900,000 loss it suffered as a result of the catastrophic June 1972 Hurricane Agnes. It sought to recover this loss within

four years. The Commissioner determined that this adjustment was inappropriate for the reason that it would be included in the rates "indefinitely" and further that the company's surplus was sufficient to cover any such loss. In view of the fact that the statute specifically mentions catastrophes as an item to be considered in the determination or justification of a casualty insurance company's rates, it is within the purview of the Commissioner's discretionary power to determine whether such a loss as was experienced by Nationwide should be given consideration and if so, over what period of time. It is interesting to note that the Commissioner's brief indicates that "fifty years is a more likely period." It is difficult from reading the adjudication to determine whether the Commissioner found Nationwide's adjustment to be inappropriate because of the time period, or its ability to recoup such a catastrophe loss out of excessive surplus. On remand, the Commissioner will be directed to make an appropriate finding from which Nationwide will be able to take an appeal or amend its filing.

"F. Profits and Surplus." This section of the adjudication is the most difficult and complex. Nationwide is a mutual company. Therefore, all of its assets and liabilities are owned by its policyholders. It does not have the usual requirements of a stock company in maintaining underwriting profits and surplus for dividend purposes. The subject involves intricate economic principles involving cyclical trends whereby the cycle of underwriting losses will permit one to reasonably expect an upswing in surplus because of the peculiar nature of more restrictive insurance coverage. It involves ratios of surplus to income.

The Commissioner, in analyzing all of these factors, made *inter alia,* the following finding: "d. Under present rates, projecting Nationwide's first six month experience through the end of 1973, Nationwide's own

management-ratio calculations anticipate a total loss, net of taxes, of only $55,000 annually. The impact on surplus, allocated to Pennsylvania on the basis of written premiums, is a negative 0.1%." Apparently the Commissioner's conclusion, that Nationwide failed to show that the proposed rate increase was required to maintain appropriate profit and surplus levels, is based upon the theory that Nationwide has a company-wide surplus to which its Pennsylvania policyholders are entitled to a pro-rata share (never adequately explained or determined), and that Nationwide could utilize such allocated surplus to cover some portion of its Pennsylvania underwriting losses. As we read the statute, the Commissioner's conclusion was in error for the reason that it relies upon speculation rather than substantial evidence. This record indicates that Nationwide experienced underwriting losses in Pennsylvania of approximately $37,000,000 for the years 1963 through 1973. The Commissioner found that without any increase being permitted, Nationwide would lose $55,000 in the test period (that determination included in revenues $3,165,000 of investment income). The Commissioner speculated upon an improved bond market, which was improper. The Commissioner's speculation that somehow Nationwide's surplus position would become better in the future is not based upon substantial evidence found in the record. On this point, however, if the record establishes that Nationwide's Pennsylvania policyholders have contributed to an unreasonably high company-wide surplus, it is conceivable that an argument could be made to include that portion of the excessive surplus contributed by Pennsylvania policyholders in the revenues of the company for rate-making purposes. That does not appear to be contained in the record of this case before us. Furthermore, the Commissioner's contention that inadequate rates for Nationwide may continue in Pennsylvania so long as

Nationwide's Pennsylvania losses do not appreciably diminish its overall surplus and reserves is erroneous. However, on remand, if the Commissioner should determine that there is excessive surplus held by Nationwide to which the Pennsylvania policyholders have contributed, he should make findings thereon and appropriate conclusions from which Nationwide may appeal or accept by way of an amended filing.

"G. Underwriting Pratices—Restrictions of Agents Binding Power." The Commissioner found that in 1973, Nationwide inaugurated a new system which restricted its agent's authority to take on new policyholders.[4] The Commissioner found this new system to be restrictive in nature and concluded that this could reduce the projected losses if an adjustment had been properly prepared. Although the record supports the finding of the Commissioner that such a program was instituted, the record is bare of any evidence which would support the Commissioner's conclusion that such a program would have an effect on the accident frequency of Nationwide's policyholders. Therefore, we conclude that the Commissioner's conclusion is speculative and on remand the Commissioner should permit his experts in the Insurance Department to submit evidence on the effect of the restrictive binding policy of Nationwide's agents from which the Commissioner can then make a finding and proper conclusion.

"H. Underwriting Practices—Nonrenewal and Cancellation." In this area, the Commissioner found that Nationwide had refused to renew 3,885 policies at the end of Nationwide's first five-year guaranteed renewable period. The Commissioner then concluded that these nonrenewals and other cancellations would reduce Nationwide's trending of past accident experience

---

[4] The limitation applies in the following five counties: Bucks, Chester, Delaware, Montgomery and Philadelphia.

and Nationwide's failure to account for this increasingly restrictive underwriting policy in its trended losses resulted in an excessive rate request. It is conceivable from our reading of the record that the Commissioner could have found an adjustment based upon the statistics presented from which Nationwide could have appealed or accepted by an amended filing. On remand, the Commissioner will be so directed.

In those categories of the adjudication entitled "I. Underwriting Practices—Poor Morals," "J. Underwriting Practices—Age and Marriage," and "K. Underwriting Practices—Tie-In-Sales," assuming all the Commissioner's findings of fact to be correct, his conclusions fail to state with any specificity the effect of his findings upon the revenues or expenses of the company from which a determination can be made as to the rate filing. In his conclusions for each category, i.e., I, J and K, the Commissioner includes the following statement: "[T]he exact effect of the alleged discrimination is uncertain. From available data it is unclear that the elimination of the specified practices will have an upward, downward or no effect on the experience or filed rates." If that is a proper conclusion, then it may be assumed that these items have no effect on the filed rates upon which the Commissioner was passing. On remand, the Commissioner will be directed to make specific findings and conclusions with appropriate and specific explanations of how these items affect the filed rate.

"L. Management and Company Policy." In these findings and conclusions, the Commissioner is hypercritical of the method of election and the makeup of the Board of Directors of Nationwide. The apparent purpose of these findings and conclusions is to highlight the Commissioner's opinion that a "consumer specialist" should be sitting on Nationwide's Board of Directors. What effect this has on the rate filing is

a mystery. It is irrelevant to the issues before us and need not be discussed.

In summary then, we hold that the findings of fact and conclusions of law made by the Commissioner are not supported by substantial evidence and some of them, as noted above, are so vague that we cannot affirm. As we read the Act, the legislative intent is to direct the Commissioner to issue an adjudication which specifies with particularity in what respects the rate filing does not meet the requirements of the Act. If some particulars of the rate filing are completely or partially unacceptable or illegal, the Commissioner's adjudication must set forth the basis for his disapproval with reference to the record or to inadequacies in the record. As we have already stated, whether or not an approach used by an insurance company in submitting a statistic is the method normally accepted is not really relevant. What is relevant is whether the statistic or method or trending technique meets the requirements of the Act. If they do not meet those requirements, then the Commissioner should advise the public and the company as to what would be acceptable so that the company or a person aggrieved can appeal or the company can file an amended rate filing.

Lastly, Nationwide charges that the Commissioner performed his duties in this case in a prejudicial manner and more as a consumer advocate than as a government adjudicator, thereby denying Nationwide due process of law. In this vein it should be noted that although we believe that the primary purpose of government regulation is for the protection of the public, and that there is a place for the consumer advocate in the fields of administrative law and government regulation, we firmly believe that it is not proper for an adjudicator to take on the role of a partisan advocate. All the regulatory statutes indicate a legislative intent to provide justice to both the public and the

regulated entity. In all of these regulatory schemes, there are provisions for representatives of the consuming public to be heard, but we must not forget that the safeguards afforded under the Constitution to all parties are equally applicable. While consumer advocates should be permitted to participate in regulatory agency hearings, our system of American jurisprudence does not permit any judicial officer, or quasi-judicial officer, to be an advocate of anything but justice. Whether the regulatory agency be a human relations commission, a public utility commission, an insurance department or any other agency directed by the Legislature to decide our citizens' rights, those persons responsible for making the decisions must decide the cases on the facts and the law, their philosophical, social and political beliefs to the contrary notwithstanding. All judicial and quasi-judicial officers in our government carry with them to their positions all of their peculiar idiosyncrasies and characteristics developed during their lifetimes, for they are only the product of their environment, training and experience. In spite of these truisms, we have a right to expect that all judicial and quasi-judicial officers of our government will carry out their adjudicative duties in an unbiased and fair manner. If due to the temper of the times we permit consumer advocate adjudicators to flavor their adjudications along the lines of their philosophical bent, then tomorrow, if there is a change in the public temper, we would have to permit company advocate adjudicators to likewise color their adjudications. Neither is acceptable.

In turning to the record before us, it becomes apparent that the Commissioner made several questionable statements which one could argue were unjudicial in nature. For example, he stated that no increase would be necessary for Nationwide "if the Commonwealth had a good no-fault insurance law" (for which

he was the leading advocate), and he obviously attempted to interject himself into the management prerogatives of an insurance company. However, the Commissioner did not prohibit Nationwide from putting anything into this record which it desired in support of its rate filing.

As has been said in many decisions, the principles of due process do not lend themselves to explicit definition, but we can state that due process involves the general attributes of fairness. *See Pittsburgh Press Employment Advertising Discrimination Appeal,* 4 Pa. Commonwealth Ct. 448, 287 A. 2d 161 (1972), and *Gaudenzia, Inc. v. Zoning Board of Adjustment,* 4 Pa. Commonwealth Ct. 355, 287 A. 2d 698 (1972). With this thought in mind, we have carefully reviewed this record and conclude that although Nationwide's contentions are tenable, we are satisfied that the Commissioner's handling of the hearing was not so arbitrary and capricious as to deprive Nationwide of its due process rights.

## ORDER

AND Now, this 12th day of August, 1974, it is ordered that the "Final Determination" (adjudication) of the Insurance Commissioner dated (apparently) September 20, 1973 in the matter of the private passenger automobile insurance rate filing of Nationwide Mutual Insurance Company is hereby set aside; and the case is remanded to the Insurance Commissioner to hold further hearings, if in his discretion he decides additional hearings are necessary, and to make specific findings of fact, conclusions of law and a final adjudication not inconsistent with the above opinion.