Commonwealth of Pennsylvania, Insurance Department v. The Pennsylvania Coal Mining Association, Kerry Coal Company, Moshannon Falls Mining Company, Shawville Coal Company, Sunbeam Coal Corporation and West Freedom Mining Corporation, Appellants. Coal Mine Compensation Rating Bureau of Pennsylvania, Intervenor.

Argued March 1, 1976, before President Judge Bowman and Judges Crumlish, Jr., Kramer, Wilkinson, Jr., Mencer and Blatt. Judge Rogers did not participate.

*John M. Elliott,* with him *Steven L. Friedman, Constance B. Foster,* and, of counsel, *Dilworth, Paxson, Kalish & Levy,* for appellants.

*Linda S. Lichtman,* Assistant Attorney General, with her *Andrew F. Giffin,* Assistant Attorney General, for appellees.

*Wilbur S. Legg,* with him *Lord, Bissell & Brook; Thomas R. Balaban;* and *Shaffer, Calkins & Balaban,* for amicus curiae, Coal Mine Compensation Rating Bureau of Pennsylvania.

OPINION BY PRESIDENT JUDGE BOWMAN, September 10, 1976:

The Coal Mine Compensation Rating Bureau of Pennsylvania (Bureau), intervening appellee, is a statistical and rating association approved by the Insurance Commissioner pursuant to Section 654 of The Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, *as amended*, 40 P.S. §814.

On September 20, 1974, the Bureau filed with the Insurance Department for approval a new rate schedule for coal mine occupational disease insurance to be effective for the period July 1, 1974 to June 30, 1975 (referred to herein as the 1974 rate filing). It is the approval of this rate filing which is the subject of this appeal by intervenor before the Commissioner.[1]

The Commissioner gave notice of the filing to interested persons and scheduled a hearing thereon for November 25, 1974. Prior to this date, the Pennsylvania Coal Mining Association and a number of surface coal mine operators (appellants) petitioned to and were allowed to intervene in the rate proceedings over the objection of the Bureau but were denied the right to cross-examine Bureau witnesses in the course

---

[1] A prior year filing for the period of July 1, 1973 to June 30, 1974—the first such filing under substantial changes in the law brought about by the Federal Black Lung Benefits Act of 1972, 30 U.S.C. §901 et seq., and amendments to The Pennsylvania Workmen's Compensation Act by Section 1 of the Act of December 6, 1972, P.L. 1627, 77 P.S. §§27.1(q), 412—presumably remained in effect until approval of the 1974 rate filing. A rate filing for the period July 1, 1975 to June 30, 1976, approved by the Commissioner was the subject of other litigation before this Court. *Insurance Department v. The Pennsylvania Coal Mining Association*, 25 Pa. Commonwealth Ct. 3, 358 A.2d 745 (1976). Intervening changes in the statutory law applicable to rate filings and the Commissioner's approval thereof between the 1974 and 1975 rate filings pose different procedural and substantive issues in this appeal and that taken to No. 1305 C.D. 1975.

of the hearing; a ruling which produced an "appeal" to this Court and resulted in an Order of this Court allowing said cross-examination. This particular point is not involved in the present appeal. Hearings were completed on April 22, 1975. On July 22, 1975, the Commissioner issued his adjudication and order approving the rates as filed. It is from this order that this appeal was taken by the intervenors before the Commissioner. The Bureau has been allowed to intervene as an appellee in this appeal.

While appellants are essentially concerned with the rates applicable to them as surface coal mine operators and not the rates applicable to subsurface coal mine operators, they do attack basic elements of the rate structure thereby generally attacking the adjudication and order.

In their brief, appellants identify five questions on appeal. However, three of them and the numerous arguments advanced in support thereof raise two basic issues. In his adjudication and order, did the Commissioner err as a matter of law and is the adjudication and order supported by substantial evidence? Another question presented—the propriety of the rates as including within the rate structure nonmining employees of the insured such as truck drivers—was not raised before the Commissioner and will not be considered on appeal. A fifth question asserts that the provisions of the Federal Black Lung Benefits Act and the amended The Pennsylvania Workmen's Compensation Act imposing liability for benefits upon "the last responsible operator" are violative of appellants' property rights under the Federal and Pennsylvania constitutions.

Section 654 of The Insurance Company Law of 1921 is the statutory law by which risks may be classified, premium rates established and rate filings are to be submitted to the Insurance Commissioner with re-

spect to workmen's compensation insurance and other coverages under related statutes affording protection to employees for occupational diseases or injury. Classification of risks, underwriting rules, premium rates and schedule or merit rating plans for such insurance coverage are to be proposed annually by rating bureaus approved by the Commissioner, such rates to be on an "equitable and impartial basis." Rate filings are subject to the approval of the Commissioner, and he is authorized to amend or modify a rate filing incident to such approval. Insurers may only issue policies classifying risks and charge premiums consistent with an approved rate filing.

Substantial changes in the Federal and State statutory law pertaining to so-called black lung coverage brought about by the Federal Black Lung Benefits Act of 1972, 30 U.S.C. §901 et seq., and amendments to The Pennsylvania Workmen's Compensation Act by Section 1 of the Act of December 6, 1972, P.L. 1627, 77 P.S. §§27.1(q), 412, effective December 6, 1972, precipitated a series of rate filings by the Bureau, intervening appellee, to provide insurance coverage to employers under this legislation. The first of such filings was approved for a one year period beginning July 1, 1973 and ending June 30, 1974. It was not the subject of an appeal or other administrative or judicial review proceedings. It provided for a composite Federal and State black lung rate of $13.09 per $100.00 of payroll, and required carriers to escrow a percentage of premiums for possible rebate to insureds based upon actual claims experience. Carriers were also directed to report actual claims within ninety days of the end of a policy year. The alleged failure or refusal of the carriers to report actual claims experience for this year incident to the 1974 rate proceedings and the approval of the 1974 rate filing by the Commissioner without a continuation of the actual

claims experience rebate provisions of the 1973 approved rates are among other reasons asserted by appellants as warranting our reversal of the Commissioner's adjudication and order. As approved, the composite rate for 1974 is $18.54 per $100.00 of payroll[2] contrasted with the prior rate of $13.09 per $100.00 of payroll.

In *Nationwide Mutual Insurance Co. v. Denenberg,* 15 Pa. Commonwealth Ct. 24, 324 A.2d 878 (1974), we adopted a scope of review on appeals from approved rate filings as originally pronounced by Judge WOODSIDE in *Pennsylvania Insurance Department v. Philadelphia,* 196 Pa. Superior Ct. 221, 173 A.2d 811 (1961):

" 'Where an administrative agency is clothed with discretion in the discharge of its duty, the court will not interfere unless the record clearly establishes that there has been a violation of positive law or an arbitrary, capricious or unreasonable determination due to the absence of substantial evidence to support the findings. Mutual Supply Company Appeal, 366 Pa. 424, 426, 77 A.2d 612 (1951); Blue Mountain T. & T. Co. v. Pa. P. U. C., 165 Pa. Superior Ct. 320, 67 A.2d 441 (1949); Insurance Company of North America v. Commissioner of Insurance, 327 Mass. 745, 101 N.E.2d 335 (1951).

" 'As stated in Blumenschein v. Pittsburgh Housing Authority, 379 Pa. 566, 573, 109 A.2d 331 (1954): ". . . it has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith,

---

[2] The third annual rate filing for the period July 1, 1975 to June 30, 1976, with respect to black lung coverage under the expanded Federal and State law was the subject of other litigation in this Court. *See* footnote 1.

fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; judicial discretion may not be substituted for administrative discretion.'' ' 196 Pa. Superior Ct. at 237, 173 A.2d at 819.'' 15 Pa. Commonwealth Ct. at 30-31, 324 A.2d at 881.

It was further observed in that same case:

'' 'Insurance rate making is a technical, complicated and involved procedure carried on by trained men. It is not an exact science. Judgment based upon a thorough knowledge of the problem must be applied. Courts cannot abdicate their duty to examine the evidence and the adjudication, and to interpret and apply the law, but they must recognize the value of the judgment of an Insurance Commissioner who is specializing in the field of insurance and the efficacy of an adjudication supported by evidence of experts who devoted a lifetime of service to rate making.' 196 Pa. Superior Ct. at 237-238, 173 A.2d at 819.'' 15 Pa. Commonwealth Ct. at 31, 324 A.2d at 881.

In this case, we would add that the technical, complicated and involved procedure of insurance rate making is aggravated by the want of actual experience in this the second year of rate making for coverage of expanded benefits for black lung claims under both Federal and State law. The expanded State black lung coverage became effective in July 1973. This rate

filing was filed in September 1974. Actual experience under the State law was virtually nonexistent.

The approved rates in question are designed to afford coverage to employers under both laws, thereby producing the so-called composite rates for this combined coverage. This want of actual experience, supplied by assumptions and projections based upon surveys, statistical reports and studies, is the focal point of appellants' attack. It also bottoms appellants' argument that the Commissioner, in not requiring premium adjustment accounts to be continued in the 1974 filing, erred as a matter of law. The 1973 approved rate filing had required use of such accounts for that year and for the occupational disease year July 1, 1974 to June 30, 1975 (the year here in question) or longer as experience and circumstances may warrant.

The positive statutory law applicable here is simply that rates for this kind of coverage shall be fixed on an ''equitable and impartial basis.'' Section 654 of The Insurance Company Law of 1921.

With recognition of our scope of review, the applicable positive law and the aggravated complexity of insurance rate making by reason of the want of actual experience, we review the particular arguments of appellants. Numerous references to and use of material not of record contained in appellants' brief in support of arguments advanced have not eased our task in doing so.

In approving the 1974 rate filing, appellants argue that the Commissioner erred as a matter of law in that the Bureau retained an actuarial firm to present to the Bureau a proposed filing, preparation of which was participated in by unqualified personnel. Even if one assumes that some personnel of this actuarial firm were not qualified to perform the work assigned

to them,[3] it is difficult to comprehend how much a want of qualification can be visited upon the Commissioner. The end product was a report and proposed rate filing submitted by a nationally recognized actuarial firm to the Bureau and adopted by the Bureau as its filing after several elements were revised. It is the Bureau and the Commissioner who are charged with the filing as being one which is on an equitable and impartial basis—not the actuarial firm or the competency of its employees. Other charges by appellants of conflicting interests and the Bureau's asserted aim of securing exorbitant profits for its members are not only unsupported by the record but detract from this argument and others advanced by appellants. A series of other contentions advanced by appellants under this broad ranging argument and similar unsupported charges are not worthy of further comment.

As a second error of law, appellants contend that the Commissioner's adjudication is based upon speculation rather than on verifiable data. There can be no question that a want of experience for the beginning of the second year of expanded black lung benefits under Federal and State law posed a problem for the actuaries, the Bureau and the Commissioner in the filing and approval of the 1974 rate filing. It is equally clear from the record that several critical assumptions and projections were made in establishing the rates. Ratings of insurance risks, particularly as to new and untested coverages, necessarily entails assumptions and projections whether characterized as informed guesses or informed judgment. This is precisely why the judiciary should not second guess or

---

[3] The record discloses only that two employees of the firm not qualified by education as actuaries researched and reviewed certain statistical reports and one participated in final calculation producing the rate filing.

substitute its judgment for that of those whose business it is to make such projections. While not specifically dealt with under the statutory law here involved, The Casualty and Surety Rate Regulatory Act, Act of June 11, 1947, P.L. 538, 40 P.S. §1181 et seq., recognizes such needs in the rate making procedure by according weight to prospective loss experience both inside and outside of Pennsylvania—necessarily a projection—and the use of underwriting practice and judgment to the extent appropriate. The want of experience under an expanded program of insurance coverage gives added importance to judgment decisions by those whose experience qualifies them to make the same. Our review of the record convinces us that as against a generalized attack that the adjudication should be struck down and the Commissioner's order set aside as a matter of law for want of substantial evidence, such action would be without merit and we will not do so. Assertions of want of substantial evidence to support a particular element of the rate structure are considered hereinafter.

Appellants next argue that the Commissioner erred as a matter of law in not requiring carriers to continue separate premium adjustment accounts for surface mine operators into the 1974 approved rates as were provided for in the 1973 approved rate filing. In approving the 1973 rates, the Commissioner stated that such accounts should be maintained for possible rebates to insureds with good experience for the year 1973, the year 1974 or longer, as experience and circumstances might warrant. The 1974 rate filing contained no such provision, and the Commissioner's adjudication approving the same is silent on the subject. Appellants contend that this constitutes a violation by the Commissioner of his 1973 order. While we agree that a governmental agency cannot violate its own orders, we believe this principle to be mis-

applied here. There is no positive statutory law that the Commissioner in 1974 is bound to continue what he believed to be a sound provision in 1973. His duty in law is to approve or modify rate filings on an annual basis for the coverage here involved. Good practice would dictate an explanation of why that which he considered sound in 1973 was not continued in 1974 as originally conceived, but we cannot find such an omission or the want of such a provision in the 1974 approved rate filing to be an error of law on the part of the Commissioner.

Two other assertions by appellants under the broad argument that the Commissioner erred as a matter of law (1) that his finding of fact No. 2 is not supported by substantial evidence and (2) that appellants were improperly saddled with the burden of proving the unfairness of the rate filing, are simply without any support in the record.

Similarly, appellants' contention that the Commissioner abused his discretion by neglecting his statutory duties and ignoring substantial evidence presented by appellants is nothing more than a reargument, in the context of an abuse of discretion, of arguments advanced and heretofore considered as constituting errors of law. We find these contentions equally unpersuasive.

The only substantial arguments advanced by appellants attack the validity of several actuarial assumptions contained in the Bureau filing and found as facts by the Commissioner in his adjudication. These findings of fact are attacked as not being supported by substantial evidence.

The rule is that the substantial evidence required to support the findings of an administrative agency must be such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. There must be more required than a mere scin-

tilla of evidence or suspicion of existence of a fact it seeks to establish. *Shive v. Bellefonte Area Board of School Directors*, 12 Pa. Commonwealth Ct. 543, 317 A.2d 311 (1974). Credibility and weight to be accorded the evidence are a determination solely within the discretion of the fact finder. *Wilson v. Philadelphia Board of License & Inspection Review*, 16 Pa. Commonwealth Ct. 586, 329 A.2d 908 (1974).

The Bureau's 1974 rate filing recommended that the rates for surface mining operators be fixed at 75% of the rate for deep mine operators. The Commissioner adopted this ratio as a finding of fact (No. 3) with seven supporting reasons and an extensive discussion in support thereof. Appellants characterize this finding as not supported by substantial evidence and insist that a survey of its members introduced into evidence discloses such a ratio should be less than 50%. The Commissioner rejected such evidence as not credible and found the supporting studies, surveys and records employed in fixing the rate to be acceptable, pending development of actual experience from claims subsequently filed and the outcome of claims filed but not yet determined. Our review of the record discloses this data to be substantial evidence sufficient to support the Commissioner's finding. To conclude otherwise would be to reject the imperative evidence upon which the Commissioner relied and reach such a conclusion solely upon appellants' survey of its members. This is not our role on review.

Appellants vigorously attack the lifetime medical expense factor incorporated by the Bureau in its rate structure and approved by the Commissioner. An element in this factor employed a national study figure of lifetime medical expenses with respect to traumatic, permanent total disability cases under workmen's compensation laws generally. This figure adjusted by actuarial consideration and projected trends of medical

costs produced a lifetime medical cost calculation of $24,327.00. Appellants contend that such a figure as applied to experienced or anticipated medical expenses under black lung claims is excessive and unsupportable. The record evidence on this subject is lengthy and complex. The Commissioner recognized the problem posed by this issue and accorded it particular attention in his adjudication. He viewed the problem, summarized the evidence and the reasons for his conclusion as follows:

"$24,327 was the figure used for the total lifetime medical benefits to be paid to black lung claimants. $24,327 is the average amount of medical expenses for traumatic injury workmen's compensation claims in all states. This figure was also used by the National Council in making black lung rate rilings [sic] in other states in 1973. Pennsylvania has a higher level of medical charges than many of those other states.

"The figure $24,327 was challenged on the ground that it covers every type of disease or injury which causes disability including those diseases and injuries which require lifetime treatment or hospitalization. It is noteworthy that black lung is not presently curable and is therefore one of those diseases or injuries which requires lifetime treatment.

"William F. Vieweg, Chief of the Technical Services Unit of the Division of Coal Mine Worker's Compensation of the United States Department of Labor testified that while their experience thus far was not credible, it indicated that medical costs of from $800 to $1,000 annually for an average life expectancy per claimant of 1 to 8 years would be an appropriate assumption. Increasing the figure for inflation produced an average total lifetime medical expense of $10,000-$12,000 per claimant.

"However, the fact that Federal claims may be made by persons no longer employed, while Act 337

does not permit such claims, would tend to make the average age of federal claimants higher than the average age of claimants under Act 337. This higher average age would tend to reduce the total federal lifetime medical expense. That being so, the life expectancy considered by Mr. Vieweg based on federal data is inadequate for the Bureau's purposes of providing for both federal and Pennsylvania claims.

"If the commonly used annual medical expense inflation factor of 13% is applied to an average life expectancy of 11 to 12 years (as Intervenor's expert witness assumed for Item 2 of Intervenor's Exhibit 28, N.T. 753), the total medical lifetime benefits rise to $21,962 at the end of 11 years and to $25,816 at the end of 12 years. Further, it is apparent that a 13% inflation factor is cnservative [sic] in view of the current medical expense climate. On the basis of the foregoing, the Department finds that the $24,237 figure used for total lifetime medical benefits is reasonable."

Appellants insist, however, that the testimony of Mr. Vieweg—commented upon by the Commissioner in his discussion—must be accepted as the more realistic and substantiated statistics because it is based upon actual Federal claims experience. Again, appellants misread our scope of review. We will not substitute our judgment for that of the Commissioner in this one element of a complex calculation involving life expectancy projections, medical cost projections and sundry adjustment to reflect medical costs as imposed by the State law as against the Federal law. Nor, in reviewing the testimony on this issue, are we impressed with the limited actual Federal claims experience testified to by Mr. Vieweg as having more than an extremely limited value in projecting medical costs under coverage designed to cover medical cost liability under the State law. There is substantial evi-

dence to support the medical expense factor contained in the rate structure and approved by the Commissioner.

Another issue raised by appellants puts into focus the uncertainties produced by and surrounding the dual existence of the Federal and State black lung laws. In his adjudication, the Commissioner found that for rate making purposes an assumption of a 75/25 split between State and Federal claims is reasonable. Actual claims experience discloses that from July 1, 1973 to April 1974 Federal claims *filed* numbered 6966 while for the same period 364 State claims were filed. Recognizing this problem, the Commissioner discussed it and resolved that the ratio used by the Bureau was reasonable. In the adjudication he said:

"5. Ratio of State to Federal Claims.

"a. The Bureau assumed that 75% of Pennsylvania's miners claiming benefits for disability, arising from black lung, caused after July 1, 1974, would perfect claims under Pennsylvania's Occupational Disease Act and only 25% would perfect claims under the Federal Act. (Dept. Exhibit 13, Section 8 (Briscoe Report)).

"b. Of 7,330 claims filed to date, 364 originated as state claims; the remaining 6,966 originated as federal claims or were filed under both Acts. Prior to the time that awards are made, the higher benefits available under Pennsylvania's statute will probably cause most claimants to exercise their right to transfer their claims to the Pennsylvania Act. The Pennsylvania Act permits the filing of a claim within two years of the commencement of a disability. In addition, under the Pennsylvania Act, benefits are allowed from the date of origin of the disability even though the claim is filed subsequently; the federal law allows

benefits only from the date of filing. (Dept. Exhibit 13, Section 8 (Briscoe Report)).

"c. The Federal law allows persons not presently employed, but who have been employed as coal miners in the past, to file claims. (N.T. 752).

"d. The Pennsylvania Department of Labor and Industry denied all claims until late 1974, because it had held (until overruled by the courts) that a substantial period of mine employment after July 1, 1973, the effective date of Act 337, was a prerequisite to recovery under Act 337. (N.T. 302).

"e. The federal legislation, which presently terminates the liability of coal mine operators for payment of black lung disability benefits in 1981, are expected to be amended to extend indefinitely beyond 1981. (Dept. Exhibit 13, Section 6 (Briscoe Report), Section 7C (Rate Filing R74-10-5))."

Our review of the record convinces us that this material finding of fact is not supported by substantial evidence. We so conclude because the 75% State-25% Federal claim ratio is not only contrary to the only evidence in the record of actual claim experience for the preceding year but also represents a complete reversal of the prior year experience. The probability of such a dramatic change from Federal to State claims wants for support in the record and appears to have been reached on speculation rather than on future trends projected upon presently known facts or supportable probabilities. The relative benefits afforded by the Federal and State acts as originally viewed by the administering agencies and now being interpreted by judicial decisions may very well trend a greater number of State claims than Federal claims in the future, but there is no evidence in the record that such a dramatic change will materialize in the immediate future simply because initial entitlement to and scope of benefits are being refined by the

courts. We are conscious, of course, of the expertise of those charged with submitting and approving rate filings and have in this case endorsed the rule that the courts should afford great weight to such expertise and not substitute its judgment for that of the experts. There is a limit, however, to such deference, which limit we must apply here as the record wants of substantial evidence to support a finding and conclusion that the immediate future will produce such a dramatic shift in claim filings.

Intervenor argues in its brief that a ratio weighted more to Federal claim filings would result in higher rates as factored into the ultimate rate structure determination. This may well be. If so, it was not expressed by the Commissioner as a consideration in approving the ratio suggested by the Bureau in its rate filing.

Finally, appellants would have us declare that the so-called last responsible employer provisions contained in both the Federal and State black lung statutes are unconstitutional as violative of their property rights under both the Federal and Pennsylvania Constitutions.

The appellant Association clearly has no standing to raise this issue nor have the appellant coal operators pointed to any evidence of record that would afford them standing as employers actually affected by these statutory provisions. Further, these statutes are not the subject of this appeal but only tangentially involved in it. To justify a determination of constitutionality, it must not only appear that the objector has standing but also that the case at hand cannot be decided without reaching the constitutional issue. In this appeal, we are concerned with administrative approval of rates and classification for insurance coverage of employers who would insure the risk of benefits provided by these statutes. It must and can be

decided without regard to whether at some future time the last responsible employer provisions of these statutes are declared unconstitutional.

For the foregoing reasons, we enter an Order reversing in part the adjudication and order of the Insurance Commissioner and remand to him for further proceedings.

ORDER

Now, September 10, 1976, the adjudication and order of the Insurance Commissioner is reversed in part and the matter is remanded to him for further proceedings consistent with the foregoing opinion. On remand, the Commissioner shall reconsider, and take additional evidence if necessary in his opinion, the propriety of the assumed 75% State-25% Federal claim ratio, and the resulting rate structure based in part upon said assumption. If upon reconsideration of such ratio and the adoption of a different ratio, he shall then determine whether the resulting rate structure and rate heretofore approved by him should be approved as filed or modified.

CONCURRING AND DISSENTING OPINION BY JUDGE CRUMLISH, JR.:

I am obliged to express my views on the procedure utilized for fixing rates for coal mine occupational disease insurance in general and, in particular, the calculation of those rates for surface coal mine operators.

The Court today has given its approval to the action of the Insurance Commissioner (Commissioner) who, upon recommendation of the Coal Mine Compensation Rating Bureau (Bureau), has approved a schedule of insurance premiums payable by surface coal mine operators doing business in Pennsylvania. In giving such approval, the Court does not deem signifi-

cant the fact that the major input to the rate-structuring decision is from the Bureau, which consists entirely of the insurers themselves and other industry-related persons such as professional actuaries.

It is well settled that we should defer to the expertise of the Bureau and the Commissioner in the area of rate making since it is they who are charged by statute with the rate-making responsibility. However, this general principle does not, in my view, authorize the setting of premium rates without some meaningful input from the affected surface coal mine operators. Although the Commissioner is authorized to receive testimony from the affected insureds, his decision to do so is discretionary as is his obligation to consider such testimony in reaching his decision. Therefore, the Court should not be hasty in resorting to the rubric of the substantial evidence rule such that judicial review becomes tantamount to a rubber-stamp process of approval of the Commissioner's action.

Rather, we should carefully scrutinze the process underlying the Commissioner's action. In so doing, we should assure ourselves that every affected insured was afforded the maximum possible opportunity to be heard. In addition, the Commissioner and his staff must employ great restraint in exercising discretion in rate making, especially where, as here, the empirical data has been supplied by the insurer-dominated Bureau and where the statutory standard[1] governing the Commissioner's exercise of discretion is so broad that it amounts to no standard at all.

Having examined the record in this case, I would agree with the Court that the Commissioner erred in adopting the Bureau's assumption of a 75/25 split between State and Federal black lung claims. There-

---

[1] Section 654 of The Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, as amended, 40 P.S. §814, defines the standard as "equitable and impartial."

fore, I would concur with the Court insofar as it has directed a remand on this issue. However, I would also remand for a re-determination of the percentage of the deep mine premium rates at which the rates for surface mine operators should be fixed. The Commissioner approved the Bureau's estimate that the surface mine rates should be 75% of the rates paid by deep mine operators. Although all persons concerned seem to acknowledge that the surface mine rates should be less than the deep mine rates since surface mining has a lower black lung hazard potential than deep mining, I am of the view that the Commissioner disregarded evidence which could have justified a lower percentage. Instead, the Commissioner adopted the Bureau's projections which were unsubstantiated by actual experience. In view of the great disparity of hazard between surface and deep mining, I would also remand on this issue.

Judge KRAMER joins in this concurring and dissenting opinion.