Colonial Gardens Nursing Home, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Department of Health, Respondent; Erwin Carner, Ed. D. et al., Intervenors.

132

Argued December 6, 1977, before President Judge
Bowman and Judges Crumlish, Jr., Wilkinson, Jr.,
Rogers, Blatt and DiSalle.

*Lester J. Schaffer,* with him *Marvin Comisky,
Sheryl L. Auerbach, Lawrence S. Rosenwald,* and, of
counsel, *Blank, Rome, Klaus & Comisky,* for peti-
tioner.

*John G. Knorr, III,* with him *Jennifer A. Stiller,* and *Jeffrey B. Schwartz,* for respondent.

*Elias S. Cohen,* with him *Vincent J. Cohen,* and *Michael Churchill,* for intervenors.

OPINION BY PRESIDENT JUDGE BOWMAN, March 2, 1978:

Before us is a petition for review by Colonial Gardens Nursing Home, Inc. (Colonial) in the nature of an appeal from an order of the Department of Health (Department) which, *inter alia,* refused to renew the license of Colonial to operate a skilled nursing facility. After sedulous examination of the weighty record in this case, we affirm the Department's order.

The events which culminated in this petition began in May, 1976. Colonial's license to operate a nursing home was to have expired on May 14, 1976. On May 3, 4 and 5, 1976, four duly authorized field representatives (surveyors) of the Department surveyed the Colonial facility to evaluate its compliance with Department regulations in order to make a recommendation regarding Colonial's impending license renewal. Surveys such as this are routinely scheduled whenever a nursing home license is about to expire. While at Colonial the surveyors discovered a series of violations of Department regulations.[1] By letter dated May 28, 1976, Colonial was informed of the alleged deficiencies, given a copy of the written report detailing the violations, ordered to submit a plan of correction within ten days, and informed that a three month provisional license was being recommended by

---

[1] Thirty-two deficiencies were listed, ranging from the rather minor—the inside of the door of the ice machine was broken—to the more serious—improper handling of medications; deficient staffing of nursing services; food not being served under sanitary conditions.

the surveyors.[2] Upon receipt of the surveyors' report and a three month provisional license recommendation, the Department's Director of the Office of Quality Assurance ordered a resurvey of Colonial, which resurvey was conducted on June 1 and 2, 1976. During this resurvey, the violations observed in May were rechecked. A large number of these previously reported violations had not yet been corrected. Additionally, it was observed that certain medical records which had been examined in May appeared to have been altered. Based upon this resurvey, the surveyors recommended nonrenewal of Colonial's license. On June 18, 1976, the Department's Director of the Office of Quality Assurance issued an order to show cause why the Department should not refuse to renew Colonial's license to operate. Hearing upon this matter commenced on September 20, 1976, before a presiding officer appointed by the Secretary of Health, and concluded after thirty-eight days of the testimony spanning a period of six months. On July 7, 1977, the Department adopted the Preliminary Report of the presiding officer, with certain exceptions, and issued its order refusing to renew Colonial's license.

The applicable statutory provisions governing refusal to issue a license to nursing homes are found in Section 1026(b) of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. §1026(b).[3] Section 1026(b) sets forth five reasons, any one of which, standing alone, is sufficient grounds for refusal

---

[2] Colonial received this information on May 29, 1976. Colonial's plan of correction, dated June 15, 1976, was not received by the Department until June 24, 1976, six days after the Department's order to show cause was issued.

[3] The functions, powers and duties of the Department of Public Welfare with regard to licensing were transferred to the Department of Health by Section 1 of the Reorganization Plan No. 2 of 1973, 71 P.S. §755-2.

to issue a license. The Department's decision not to renew Colonial's license was based upon two of the reasons set forth in Section 1026(b): to wit, "(1) [v]iolation of or non-compliance with the provisions of this act or of regulations pursuant thereto"; and "(2) [f]raud or deceit in obtaining or attempting to obtain a license." With regard to the reasons for refusal to renew its license, Colonial's argument before this Court was directed exclusively to the insufficiency of evidence to sustain the finding of fraud in attempting to obtain a license. Since we find substantial evidence in the record to support the finding of fraud in attempting to obtain a license, we shall not address the question of the sufficiency of evidence to support the finding of violation of or noncompliance with regulations or statutory provisions.[4]

Our scope of review in this case is established by Section 44 of the Administrative Agency Law.[5] Therein, the legislature has provided, *inter alia*, that a reviewing court shall affirm an adjudication unless it shall find "that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Borough of Wilkinsburg v. Sanitation Department of the Borough of Wilkinsburg*, 16 Pa. Commonwealth Ct. 640, 651, 330 A.2d 306, 312 (1975). "There must be more required than a mere scintilla of evidence or suspicion of existence of a fact it seeks to establish." *Insurance Department v. The Pennsylvania Coal Min-*

---

[4] We note that twenty-two of the twenty-five "Conclusions of Law" enunciated in the presiding officer's Preliminary Report as well as a substantial portion of the "Discussion" section, are devoted to Colonial's violations of Department regulations.

[5] Act of June 4, 1945, P.L. 1388, *as amended*, 71 P.S. §1710.44.

*ing Association*, 26 Pa. Commonwealth Ct. 348, 359-60, 363 A.2d 823, 828 (1976).

The presiding officer concluded that "Colonial Gardens committed fraud and deceit in attempting to obtain a license in that it altered medical records of patients to intentionally misrepresent either that records were properly kept or that treatment was properly provided."[6] This conclusion of law was based upon the following finding of fact: "Between May 5 and June 18, 1976, Colonial Gardens deceitfully altered the medical records of Patients No. 21, No. 22, No. 4 and Patient No. 5." In the "Discussion" section of his Preliminary Report, the presiding officer also mentions alteration of the medical records of a sixth patient, No. 23.

We have reviewed the testimony of the Department's witnesses regarding each of these medical records and we have examined the exhibits themselves: a blood pressure chart; several documents labelled "Nurse's Notes"; and several documents entitled "Doctor's Orders and Progress Notes." We have also reviewed the testimony of Colonial's witnesses regarding these same exhibits. While the testimony offered by Colonial tends to negate a finding of alteration, the evidence presented by the Department clearly supports such a finding, and is, we believe, such evidence as a reasonable mind would accept as adequate to support the finding of alteration.

---

[6] Since Department regulations establish procedures to be followed in the keeping of patient medical records, *see* 28 Pa. Code §§211.7-211.12, and since the finding of a violation of these regulations could, in and of itself, result in refusal to issue a license, *see* 62 P.S. §1026(b)(1), we believe that the alteration of medical records during the course of a licensure survey in order to produce the appearance of compliance with regulations constitutes fraud or deceit in attempting to obtain a license.

The record contains the testimony of two registered nurses, Ms. Passerin and Ms. Schneider, both of whom were Department surveyors on the May, 1976 and June, 1976 surveys of the Colonial facility. Ms. Passerin testified with regard to a blood pressure chart of Patient No. 21; certain nurse's notes and doctor's orders and progress notes relating to Patient No. 13; certain nurse's notes relating to Patient No. 22; and certain doctor's orders and progress notes relating to Patient No. 23. Ms. Schneider testified with regard to certain nurse's notes for Patients Nos. 4 and 5. The substance of the testimony of these two witnesses with respect to the above mentioned documents is that subsequent to their initial examination of each of these documents, either additional written material appeared, such as postdated monthly summaries previously omitted from nurse's notes, or written material which had originally appeared on the documents had been changed, such as a note initially dated "8/13" being dated, upon subsequent examination, "9/13." The presiding officer, accepting this testimony, characterized this conduct of Colonial as "[a]ltering records in an obvious attempt to cover its tracks to obtain a license renewal. . . ."

As in any case where there is conflicting testimony, the issue is reduced to one of credibility. As this Court previously has stated, "[c]redibility and weight to be accorded the evidence are a determination solely within the discretion of the fact finder." *Insurance Department v. The Pennsylvania Coal Mining Association, supra* at 360, 363 A.2d at 828. The presiding officer in this case, referring specifically to the Department witnesses testifying about the alterations, found that these witnesses "were very well qualified, sincere, knowledgeable in their field and credible." We cannot, as an appellate court, even if we were so inclined, supplant the fact-finder's evaluation of witness

credibility. Accepting the testimony of Ms. Passerin and Ms. Schneider as credible, we find substantial evidence to support the finding of fraudulent alteration.

We turn now to the other issues raised by Colonial.

Colonial argues that the patients at Colonial have been denied due process of the law because, without notice or an opportunity to be heard, the Department has determined that they must be relocated. We decline to address this issue because we find nothing in the record to indicate that Colonial raised this issue below. *See* Section 42 of the Administrative Agency Law, 71 P.S. §1710.42. *See also* Pa. R.A.P. 1551(a).

Colonial argues that it has been unconstitutionally deprived of equal protection of the law because the Department has "singled it out as the initial target of a new program" launched against Commonwealth nursing homes. Since we find no "intentional discrimination in the enforcement of the law" by the Department in this proceeding, we reject Colonial's argument. *Commonwealth v. Barnes & Tucker Co.*, 455 Pa. 392, 416 n.14, 319 A.2d 871, 884 n.14 (1974); *see also Kroger Co. v. O'Hara Township*, 243 Pa. Superior Ct. 479, 482, 366 A.2d 254, 256 (1976).

Colonial next argues that the Department failed to give it proper notice of the violations observed at the facility and failed to give it a reasonable time within which to correct such violations prior to deciding not to renew Colonial's license. We believe that the Department's letter of May 28, 1976 and the detailed, fifteen page enclosure, listing the deficiencies observed by the Department and citing applicable regulation numbers, satisfies the written notice requirements of Section 1026(a) of the Public Welfare Code, 62 P.S. §1026(a). This written notice was received by Colonial on May 29, 1976. This same notice requested Colonial to "[e]nter your plan of correction beside each deficiency listed, including estimated date of correc-

tion of the deficiency, and return to this office within ten (10) days of the date of this letter." We believe this language satisfies the provision of Section 1026(a) that the offending person shall be required "to take action to bring the facility into compliance with this act or with the relevant regulations within a specified time." 62 P.S. §1026(a).

Colonial also argues that the presiding officer erred in permitting the Department to introduce evidence of Colonial's past (*i.e.*, pre-1976) violations of Department regulations. Inasmuch as the presiding officer specifically stated in his Preliminary Report that "the past violations were only relevant insofar as they reflect on the good faith of Colonial Gardens in its requests for further opportunities to comply," and in light of the presiding officer's express recognition "that Colonial Gardens' license could only be denied based upon violations as set forth in the Order to Show Cause . . ." we find no prejudice resulting to Colonial as a result of the admission of this evidence.

Finally, we find no merit in Colonial's argument that the presiding officer and the Department erred in imposing sanctions against Colonial without considering improvements allegedly implemented at the facility subsequent to June, 1976. Colonial has cited no legal authority for its premise that there is any duty upon the Department to make such consideration subsequent to the issuance of an order to show cause. Moreover, the finding of fraud in attempting to obtain a license would not be vitiated, even if Colonial had corrected each of the numerous violations of regulations with which it was additionally charged.

Accordingly, we affirm the order of the Department.

### Order

Now, March 2, 1978, the order of the Department of Health is hereby affirmed.